Filed 4/8/14  P. v. Smith CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E056488 |
| v. | (Super.Ct.No. INF10001803) |
| GAREY LEE SMITH, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Richard A. Erwood, Judge.  Affirmed.

Suzanne G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted defendant, Garey Smith, of first degree murder (Pen. Code, § 187, subd. (a)),[1] during which he discharged a firearm, proximately causing death. (§ 12022.53, subd. (d).) He was sentenced to prison for two 25-year-to-life terms and appeals, claiming the jury was misinstructed and his motion to acquit should have been granted. We reject his contentions and affirm.

### FACTS

Defendant and the victim had been married for 37 years and they were reasonably happy with each other, although there had been some financial problems close to the time of the murder. They had a routine of arguing whenever they went out socially over when they should leave—the victim insisting that they leave when she wanted to and defendant insisting that they stay until he was ready to go—but they had never become physical with each other over it. On August 22, 2010, this same argument erupted during a barbecue at their son's home, but this time the victim asked her daughter-in-law to intervene with defendant on her behalf, which the daughter-in-law did. Defendant was unmoved, but his son was not—he told defendant that defendant, not his wife, needed to deal with the victim. This angered defendant, who, in a huff, instructed the victim that they were leaving and they did. Hours after returning home, defendant shot the victim seven times while the latter was in their bed. Other evidence adduced during the People's case-in-chief will be described in connection with one of the issues discussed.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Defendant testified at trial that after the couple got home and the victim went to bed, he resolved to take several of his prescription sleeping pills, then shoot himself, as the weight of a prior tragedy involving his grandson and the couple's financial problems were too much to bear. He left a note on the back patio to his children, asking their forgiveness for what he was about to do, curiously omitting any mention of the victim. He went into the couple's bedroom, where he thought the victim was sleeping, turned on the light, retrieved his gun from the bedstead, went into the adjoining bathroom and pocketed his pill "minder" containing his daily dosage of prescription medication and his bottle of prescription sleeping pills and was coming out of the bathroom when the victim said, "Huh, kill yourself, you worthless bastard." The words triggered a rage in defendant that dated back to his treatment by his father during his childhood and, holding his gun in both hands, he shot the victim several times, killing her. He went outside and smoked two cigarettes, then called 911, although he told the dispatcher that he had just shot the victim "a second ago." He went out the front door, then retuned inside when he heard the police out front in order to take some of his sleeping medication and drink a beer, then he knocked on his stepson's bedroom door and yelled in that he had killed the victim and the police were there. In none of the statements defendant made after shooting did he claim that he shot the victim because she had said something to him. Defendant had become despondent following the accident involving his grandson two years previously and there was fear that he might try to harm himself. While defendant was in jail following his arrest, a friend talked to him on the phone and asked him not to

3

kill himself in jail.  Defendant said that he no longer thought of killing himself, that he did not want to live the way he was living, but now he does not have to live that way.

**ISSUES AND DISCUSSION**

1.  *Jury Instructions*

"[T]he '"existence of provocation which is not 'adequate' to reduce . . . the . . . offense [from murder to manslaughter] may nevertheless raise a reasonable doubt that the defendant formed the intent to kill upon, and carried it out after, deliberation and premeditation'"—an inquiry relevant to determining whether the offense is premeditated murder in the first degree, or unpremeditated murder in the second degree." (*People v. Carasi* (2008) 44 Cal 4th 1263, 1306.)  "The test of whether provocation or heat of passion can negate malice so as to mitigate murder to voluntary manslaughter is objective.  [Citations.] . . .  The test of whether provocation or heat of passion can negate deliberation and premeditation so as to reduce first degree murder to second degree murder . . . is subjective. (*People v. Padilla* (2002) 103 Cal.App.4th 675, 678.)

Indeed, the instruction given here as to the provocation necessary to reduce murder to manslaughter, CALCRIM No. 570, provided that the provocation must have been such that it "would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment.  [¶] . . . [¶] . . . The defendant is not allowed to set up his own standard of conduct. . . .  In deciding whether the provocation was sufficient, consider whether a person of average disposition

4

in the same situation and knowing the same facts would have reacted from passion rather than from judgment." However, the instructions given placed no qualifiers on the provocation that would create a reasonable doubt that defendant had premeditated and deliberated, thus reducing first degree murder to second degree—neither did they specify that the objective test for provocation to reduce murder to manslaughter did not apply to the provocation that reduced first degree murder to second. Therein, lies the problem involved here.

a. *Giving CALCRIM No. 522 in Combination with the Definition of Provocation in CALCRIM No. 570*

The jury was given CALCRIM No. 522, as follows, "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

Defendant here contends that there is a reasonable likelihood (*People v. Cross* (2008) 45 Cal.4th 58, 67, 68) that the giving of CALCRIM No. 522, in conjunction with CALCRIM No. 570, caused the jury to graft the language of CALCRIM No. 570 pertaining to the provocation that reduces murder to voluntary manslaughter, requiring

provocation that meets the objective test, onto the provocation that reduces first degree murder to second degree murder.  We disagree.

CALCRIM No. 570, given here, provides, in pertinent part, "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.  [¶]  The defendant killed someone because of a sudden quarrel or in the heat of passion if:  . . .  [¶]  As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment . . .  [¶]  . . .  [¶]  . . . [that is, he] act[ed] without due deliberation and reflection . . .  [¶]  . . .  *AND* . . .  [¶]  [t]he provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."  In contrast, the instruction given on first degree murder provided, in pertinent part, "The defendant is guilty of first degree murder if the People have proved that he acted . . . deliberately, and with premeditation. . . .  The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. . . .  [¶]  *A decision to kill made rashly, impulsively . . . or without careful consideration is not deliberate and premeditated* . . . .  The test is the extent of the reflection . . . ."  Thus, it is clear from these instructions that the first requirement for the provocation that reduces murder to manslaughter is tantamount to the *only* requirement for the provocation that reduces first degree murder to second degree, i.e., that defendant acted rashly and with obscured reasoning or judgment without due deliberation and refection or rashly, impulsively and

6

without careful consideration.  However, the provocation that reduces murder to manslaughter has *an additional* requirement and that is the objective reasonableness of the defendant's reaction to the provocation.

CALCRIM No. 570 also contained an additional requirement for the provocation that reduces murder to manslaughter thusly, "*Provocation that reduces murder to manslaughter* must be [the] actions of the person killed."  Besides containing an additional express qualifier for the provocation that reduces murder to manslaughter, that the instruction on the provocation that reduces first degree murder to second degree murder did not expressly contain, the wording of the instruction itself drew the jury's attention to the notion of "provocation *that reduces murder to manslaughter*," thus suggesting that it is distinct from provocation that reduces first degree murder to second degree.

Finally, when a challenge is mounted that the instructions did not correctly state the law, we look to whether the arguments of counsel did so.  (*People v. Kelly* (1992) 1 Cal.4th 495, 526.)  In their opening and closing arguments, whenever the People addressed the provocation that met the objective test, they made clear that they were referring only to the provocation that reduces murder to voluntary manslaughter.  Defendant, who invited the jury to convict him of voluntary manslaughter based on provocation, was clear when he was talking about the provocation he claimed led to the killing of the victim, that it was the provocation that reduced murder to manslaughter.  In discussing the People's theory, which was that defendant committed premeditated and

7

deliberate murder, defendant argued, "The instruction [on first degree murder] . . . tell[s] you that a decision to . . . kill made rashly, impulsively, without careful consideration is not deliberate and premeditated. . . . [¶] . . . [¶] . . . [CALCRIM No.] 522 . . . talks about [how] provocation can reduce first to second degree murder. *What that's about is if you have a provocation, it doesn't rise to the level of one that would reduce the murder to manslaughter, as the language in the instruction goes.* You can still consider any *provocation, regardless of whether it's that definition or not, in determining whether somebody carefully considered a decision to kill. There's no special definition for provocation when it applies to whether somebody premeditated and deliberately killed.* [¶] And so the caveat is, remember, a person who's provoked in some way may not carefully consider his actions and, therefore, may not premeditate and deliberate. *And this can include things like nagging or the yelling in the car or for any number of things that wouldn't be legally sufficient provocation to undermine malice aforethought . . . but might cause a person not to carefully consider what they're doing, which is the gravamen of premeditation, deliberation.*"

Under the foregoing circumstances, we conclude that there is no reasonable likelihood that the jury believed that the objective test for provocation that reduces murder to manslaughter was also required for provocation that reduces first degree murder to second degree murder.

In *People v. Rogers* (2006) 39 Cal.4th 826, the California Supreme Court rejected the defendant's contention that the trial court should have given CALJIC No. 8.73, which

8

provided, in pertinent part, "When the evidence shows the existence of provocation that played a part in inducing the unlawful killing . . . , but also shows that such provocation was not such as to reduce the homicide to manslaughter, and you find that the killing was murder, you may consider the evidence of provocation for such bearing as it may have on the question of whether the murder was of the 1st or 2nd degree." The Supreme Court held, "[T]he standard manslaughter instruction is not misleading, because the jury is told that premeditation and deliberation is the factor distinguishing first and second degree murder. Further the manslaughter instruction does not preclude the defense from arguing that provocation played a role in preventing the defendant from premeditating and deliberating; nor does it preclude the jury from giving weight to any evidence of provocation in determining whether premeditation existed." (*Rogers*, *supra*, at p. 880.)

We are not persuaded that the presence of CALCRIM No. 200 in this trial requires a different conclusion. The jury was instructed, as it provided, in pertinent part, "Some words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. Please be sure to listen carefully and follow the definitions that I give you. Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings." We disagree with defendant that this instruction somehow suggested to the jury that the objective reasonableness of the defendant's reaction to the provocation required for provocation that reduces murder to manslaughter also applied to provocation that reduces first degree murder to second degree.

9

Provocation was never *defined* for the jury for either the type that reduced murder to manslaughter or the type that reduced first degree murder to second degree murder.[2] In fact, the instruction on provocation that reduces murder to manslaughter expressly provided, "no specific type of provocation is required." More importantly, the objective standard is targeted not at the provocation but at defendant's *reaction* to it.[3]

   b. *Trial Court's Failure to Give Defendant's Requested Instructions*

Below, defendant unsuccessfully requested, principally, that CALJIC No. 8.73, or, alternatively, his modified version of CALCRIM No. 522 be given. As already stated, CALJIC No. 8.73 provided, "If the evidence establishes that there was provocation which played a part in inducing an unlawful killing . . . , but the provocation was not sufficient

---

   [2] This is despite the wording in the instruction for provocation that reduces murder to manslaughter that "the defendant must have acted under the . . . influence of the provocation *as I have defined it*."

   [3] Defendant also takes issue with CALCRIM No. 522's use of the word "reduce" as concerns provocation that reduces first degree murder to second. We do not agree with defendant's interpretation that using this word suggests that the jury must first find that defendant deliberated and premeditated, then perform the irrational task of finding that because of provocation, he could not have. What is implied by the use of this term is that the first degree murder that the evidence otherwise demonstrates is actually second degree murder because of the presence of provocation. Additionally, the instruction on first degree murder, discussed above, provides that the jury cannot find premeditation and deliberation if they conclude that provocation caused the defendant to rashly, or without careful consideration, decide to kill. Under such circumstances, there would be no preliminary finding of premeditation and deliberation with no room to allow for a second degree murder conviction. Finally, in their argument to the jury, the People did not dispute the defendant's anticipated argument that it was the People's burden to prove beyond a reasonable doubt that the killing was not voluntary manslaughter *before* the jury could turn to an analysis of whether it was first or second degree murder.

10

to reduce the homicide to manslaughter, you should consider the provocation for the bearing it may have on whether the defendant killed with or without deliberation and premeditation." After the trial court expressed displeasure with the use of the words, "you should consider" in this proffered instruction, defense counsel below offered to modify it to say, "you may consider."[4]

Defense counsel's modified version of CALCRIM No. 522 contained a number of provisions that were included in the unaltered version of CALCRIM No. 522 that was given to the jury. However, it contained the following provisions that were not otherwise covered by the instructions given, "Provocation, for purposes of th[e] instruction [dealing with provocation for reducing first degree murder to second degree], has its everyday meaning, and not the meaning defined in the instructions on reducing homicide to manslaughter. [¶] Even if the evidence establishes the provocation was not sufficient to reduce the homicide to manslaughter according to the other instructions, you should still consider whether that same provocation demonstrates a lack of premeditation and deliberation as I have defined it."

Because both of the proffered instructions were correct statements of the law, the trial court was correct in refusing to give either only if, as it concluded, the concept they conveyed were adequately covered by other instructions given. (*People v. Burney* (2009)

---

[4] Ironically, CALCRIM No. 522, which was given, provided, in pertinent part, "If you conclude that the defendant committed murder but was provoked, *consider* the provocation in deciding whether the crime was first or second degree murder."

47 Cal.4th 203, 246; *People v. Adrian* (1982) 135 Cal.App.3d 335, 341-342.) We have already concluded that it was.

2. *Trial Court's Failure to Grant Defendant's Motion to Acquit*

Defendant here contends that the trial court erred in denying his motion to acquit at the close of the People's case-in-chief, i.e., in determining that there was sufficient evidence to go to the jury that defendant had premeditated and deliberated the killing of the victim. We disagree.

All the foregoing evidence was presented during the People's case-in-chief: defendant's son testified that defendant was upset when he went inside at the barbecue to deal with the victim after the son had told defendant to "handle" the situation rather than defendant making the son's wife do it. Defendant's daughter-in-law testified that defendant was mad when defendant's son told his father to deal with the victim. She went on to say that, as a result, defendant came into the house in a huff, grabbed his stuff, told the victim, "Let's go," reminded her that she was the one who wanted to leave, rushed her outside, and was angry and rude to her, although when he came back in a short time later to retrieve something he had forgotten, he appeared to be less angry. Defendant's stepson, whom defendant had raised as his own since the former was two years old and was also at the barbecue, testified that defendant was "pissed off" and he told his son that he was embarrassed at the son telling him to take care of the situation with the victim. The stepson stayed at the barbecue for another hour, so he would not have to return to the family home and listen to defendant and the victim argue. However,

12

they were arguing when he got home, although they stopped when they saw him in the house. The victim was still upset. During a discussion later between the stepson and defendant on the back patio, defendant said he was very angry at the victim for wanting to leave the barbecue, was "really mad" at her for being upset that he had flirted at the gathering and that she had "embarrassed the shit out of him." Defendant told the stepson that he was so angry that he kicked a crock pot or pan in the kitchen. Defendant went back into the house, then returned to the patio, where he and his stepson discussed the women who had been at the barbecue. Defendant seemed calmer. After the stepson went to bed, something startled him awake and he got up to use the bathroom. Although when he had gone to bed, the lights in the victim's bedroom and adjoining bathroom were off (the television was on), they were now on. The victim was lying on her right side, facing the master bathroom. The stepson returned to bed, but soon after was awoken by the defendant knocking on his bedroom door, telling him that he had killed the victim. The stepson ran into the master bedroom and discovered the victim's body, which was in the same position he had seen it earlier. The stepson then followed defendant outside to the waiting police, yelling to defendant that he hated him, that he could not believe what defendant had done, that defendant was a coward, a weak man, and calling him every name in the book. Defendant responded, saying that his stepson was lucky that defendant hadn't killed him.[5] The stepson testified that defendant kept a 9-millimeter gun under his

---

[5] A police officer verified that defendant had said this to his stepson.

side of the mattress, near the head. The jury was shown pictures of the couple's bedroom, including from the area where the stepson testified the gun had been kept, around the foot of the bed, to the area from whence the victim had been shot. The stepson reported that defendant got upset pretty quickly and that he threw things when angry.

A tape of defendant's call to 911 was played for the jury. On it, defendant said he had just shot the victim "a second ago." He said she was dead, that he shot her five times and he repeated that she was dead. He said the gun was in his pocket, but he was putting it on the patio table. He said he thought his stepson was passed out and did not hear the shooting. He said he was sorry. He described the vehicles that were parked outside his front door, in response to the dispatcher's question about them. He said he was going to open the front door so the arriving officers would not break it down. Then he laughed. He said, "I cain't [*sic*] live like this no more." In response to the dispatcher's question, he said he wasn't going to harm himself. He again laughed, this time slightly, as he explained how he had drinks at the barbecue, adding, however, that he did not have as many as did "everybody else" at the gathering. He described his gun and repeated that he shot it five times, adding that all the bullets hit the victim. He then said something about knowing that he would never be able to do something again for the rest of his life and he laughed again. He said, "I know what I did, I know why I did it. The whole thing. I just . . . cain't [*sic*] live like this no more." Somewhat laughing, he said that he wanted to cry, then he laughed again. While outside leaning on one of his cars, he said he was glad

14

his stepson did not wake up and come out because defendant "didn't want any confrontation." Defendant, perhaps softly crying, added that he would not have hurt his stepson—that he would have laid the gun down or he'd let the stepson shoot him. The responding police officers could then be heard in the background, commanding defendant to come out and put his hands up. Then the stepson is heard, emotionally demanding to know why defendant killed the victim. The recording of the call is dramatic in that, except where noted in the above description, defendant was calm, collected and not the least bit emotional. In fact, the one emotion on display by defendant is laughter. This is particularly impactful when the anguished voice of the stepson is heard. The contrast between the two is shocking.

The police were dispatched to defendant's house at 11:53 p.m. A deputy sheriff testified that the detained defendant said, "I killed her. I shot my wife." On a table on the back patio was a note in defendant's handwriting that read, "'How do I say this, Lord? I am not going to be [unintelligible]. I love my family. JED.[6] Please forgive me. Dad." Another deputy sheriff testified that while defendant sat handcuffed in the back of a patrol car, defendant spontaneously said, "I know what I did was wrong. There's nothing wrong with me. I know what I did was wrong." A third deputy asked defendant, who had a bandage on his face[7] whether he needed medication. Defendant said he had

---

[6] Defendant's son's first name was Doug. Defendant's stepson's first name was Erick. Neither of the victim's names starts with the letter J.

[7] An investigator testified that this was due to an earlier removal of a cancer.

15

already taken his medication because he knew he was going to jail. In defendant's pockets were a 7-day pill dispenser, containing various pills, and another bottle of pills.

The pathologist testified that the victim had sustained at least seven gunshot wounds—four were entrance wounds to the face, one of which was just below the nostril, the bullet lodging in the brain, and the other three to the left side of the face that came out the right side of the head. All four were instantaneously fatal. Another bullet, which was nonfatal, skimmed the center of the victim's chest and went through her left elbow and right hand. Two more went into the center of the chest and exited the right back, piercing the right lung. The majority of people would have died from these chest wounds. Stippling on the victim's left face indicated that the end of the barrel of the gun had been between 2 inches and 2 feet from her face when fired.

Defendant asserts here, as he did below, that there was insufficient evidence presented during the People's case-in-chief to support a finding by the jury that he premeditated and deliberated the killing of the victim. As defendant states, we must determine "whether [all] the evidence furnishes a reasonable basis for inferring premeditation and deliberation, or leaves the question only to conjecture and surmise." Defendant calls our attention to the factors outlined in *People v. Anderson* (1968) 70 Cal.2d 15, 27, i.e., planning activity, evidence of motive and the manner of killing. As defendant states, when evidence of all three is not present, some evidence of motive combined with evidence of the manner of killing is sufficient. Of course, "'these categories of evidence . . . [citation] "are descriptive, not normative." [Citation.] They

16

are simply an "aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." [Citation.]' [Citation.]" (*People v. Elliot* (2005) 37 Cal.4th 453, 470-471.)

There was indisputably evidence of motive, supplied both by the testimony of the son, his wife and the stepson and the statements defendant made during the 911 call. As to the note that defendant wrote, there were two reasonable inferences the jury could have derived. One was that he wrote it just after he shot the victim. However, the fact that when he called 911 he reported that he had just shot the victim "a second ago" suggests that he could not have had time to write the note after he shot her. The other, and more reasonable inference under the circumstances, was that he wrote the note before he shot her. We observe that the note did not mention her and was addressed to his children as an apology for killing their mother. The jury could reasonably infer that defendant wrote the note before killing the victim and it certainly constituted evidence of planning activity. The time defendant spent on the patio talking to his stepson and remaining out there after the stepson went to bed provided time for him to think and write the note. In the same category is the fact that defendant placed his pill "minder" and a bottle of pills in his pocket. Again, the jury could have inferred that he did this after he shot the victim. However, it was equally reasonable for the jury to infer that he did this before he shot the victim, anticipating that he would shoot her, someone would call the police in response to the noise generated by the shooting and the police would come to arrest him. As with the

17

note, this latter inference is the more reasonable one when considered with defendant's statement during the 911 call that he had just shot the victim a second ago. If defendant called 911 immediately after shooting the victim, he would not have had time to place the pill minder and bottle of pills in his pocket. We note that throughout the 911 call and during every admission defendant made concerning the killing, he did not cite as a reason for shooting the victim anything that suggested that it was done rashly or without consideration. In fact, defendant's repeated assertions, during the 911 call, that he could not live like this any longer suggested a wearing down of defendant over time until he got to the point where he could not tolerate the victim's presence in his life any longer. This does not lead to the conclusion that the shooting was unconsidered or rash. The jury could reasonably infer, based on what defendant said during the 911 call, that defendant waited until his stepson had "passed out" to fatally shoot the victim. This also constitutes planning activity. The jury could also reasonably infer that defendant got the gun, walked around the foot of the bed and got within two feet of the victim in order to shoot her in the face.[8] The method of death—four bullets to the face and three to the chest, the

---

[8] We are puzzled by defendant's apparent unwillingness to concede that the jury could reasonably infer that he walked around the bed to shoot the victim. While, as defendant asserts, it is unclear exactly where defendant was when he shot the victim it is beyond dispute that if the gun was where he told the stepson he kept it, i.e., under his side of the bed near the head, he would have had to retrieve it from there, and walk some distance to be able to get to the victim's side of the bed to shoot her at close range. While it is possible that the victim was awake and moving around when she was shot (although defendant has no basis to assert, as he does, that she was "likely" sitting up in bed when she was shot), it was equally possible that she was asleep on her right side and the most likely way defendant shot her was to approach her side of the bed and fire from there.

*[footnote continued on next page]*

ones to the face fired at very close range, clearly is the type of method of death that suggests premeditation and deliberation. (See *People v. Gonzales* (2005) 126 Cal.App.4th 1539, 1552.) The fact, as defendant points out, that according to the stepson, defendant appeared calmer closer to the time of the shooting than he had been before suggested that the shooting was not rash or impulsive. Although, as defendant argues, it was routine for defendant and the victim to argue over leaving social gatherings before defendant was ready to go, defendant seemed to be particularly perturbed by being called out about his behavior in this regard by his son at the barbecue. The jury was free to infer that this was what made this fight between defendant and the victim different from all the previous ones.

---

*[footnote continued from previous page]*
Defendant's assertion that the victim was sitting up when shot is based solely (as to evidence adduced during the People's case-in-chief) on the location of one of the shell casings under her body. However, the victim's body had been rolled over by someone from the coroner's office and that shell casing then "appear[ed]" to have been under her body. Moreover, there was no expert evidence (or any evidence at all) how the location of the casing, even if under the body, meant in terms of the position of the victim at the time of the shooting.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
                                                    P. J.


We concur:

MILLER
                    J.

CODRINGTON
                    J.