[No. B173126. Second Dist., Div. Four. Feb. 23, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK ANTHONY GONZALEZ, Defendant and Appellant.

**COUNSEL**

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, William T. Harter and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GRIMES, J.**[*]—Mark Anthony Gonzalez appeals from the judgment entered following a jury trial which resulted in his conviction of attempted premeditated murder (Pen. Code, §§ 664, 187, subd. (a); count 1)[1] and assault by a state prisoner (§ 4501; count 3). The jury also found it was true that during both crimes he personally used a deadly weapon (§ 12022, subd. (b)(1)), and in committing the attempted premeditated murder, he inflicted great bodily injury (GBI) (§ 12022.7, subd. (a)). Appellant admitted to having committed a serious and violent felony which qualified as a strike offense under the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)). He was sentenced to prison on count 1 to an indeterminate term of 14 years, or double the seven-year minimum term, to life, plus a determinate term of four years, consisting of the three-year GBI and the one-year deadly weapon enhancements.[2]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] All further section references are to the Penal Code unless otherwise indicated.

[2] In appellant's first trial, the jury found appellant guilty of custodial possession of a weapon (§ 4502, subd. (a); count 2), and a mistrial was declared after the jury was unable to reach a verdict on the attempted premeditated murder charge (count 1). After the retrial, at sentencing, his original prison sentence of nine years on count 2 was vacated and he was resentenced to two years, which sentence was stayed under section 654.

Appellant contends that the trial court deprived him of his rights to due process and a fair trial under the federal and state Constitutions by denying his requested continuance, made midtrial, to meet the offered testimony of the People's gang expert whose identity had been disclosed to the defense three weeks before trial. He also contends the admission of gang expert testimony relevant to his intent, the critical issue on count 1, was reversible error.[3] He also contends the evidence was insufficient to support a finding that he acted with the intent to kill.

Based on our review of the record and applicable law, we affirm the judgment.

## FACTUAL SUMMARY

We review the evidence in the light most favorable to the People and presume the existence of every fact the trier could reasonably deduce from the evidence that supports the judgment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].) The following summary is based on this appellate standard of review.

It was uncontroverted that appellant stabbed Hugo Cruz many times during an unprovoked attack in the Los Angeles Men's Central Jail. On May 29, 2003, around 7:15 a.m., appellant and Cruz were housed in separate one-man cells in the jail's discipline module, which was the area designated for jail rule violators. On that morning, appellant and Cruz were among approximately 10 inmates, wearing only boxer shorts and shower shoes, who were escorted by two sheriff's deputies from their cells to the shower area. Ordinarily, when inmates were escorted out of the discipline module, they were waist-chained and handcuffed. The only time inmates ever left the discipline module without waist chains and handcuffs and were near one another without restraints was when they were taken in small groups to the showers. They were not searched before entering the showers.

After showering silently and without incident, the men began walking back to their respective cells. They were monitored by two deputies through security gates. No deputy walked on the row with the inmates because of the

---

[3] In his opening brief, appellant contends his motion for a new trial on this ground was "erroneously denied." We deem the point to be waived because it was asserted without pertinent argument or citation to applicable authority. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481].)

security risk of being outnumbered, and the inmates were not required to walk in the usual single-file order. The cell gates had been left open, and the inmates were supposed to enter their cells and wait for the deputies to close the gates. As appellant and Cruz reached cell 4, appellant, who was the last person walking down the row, and Cruz, who was second to last, were basically side-by-side.

Suddenly, without a word, appellant punched Cruz on the left side of his jaw. Cruz had done nothing to provoke the attack. Cruz fell to the floor on his side. Appellant pulled something from his boxer shorts and with a stabbing motion, struck Cruz with a closed fist 12 to 14 times. A piece of metal sticking out from the top of his fist appeared to be a "shank," a makeshift stabbing weapon, usually made from metal found in the jail.

One of the deputies immediately ordered the other inmates into their cells. The deputy repeatedly shouted for appellant to stop fighting but appellant ignored the orders to stop. The deputy radioed for backup, and backup deputies arrived within seconds. Appellant got up, stepped over Cruz, and returned to his cell. A deputy opened his gate, he entered the cell, and the deputy locked it. More than 10 deputies began a search for the shank. Within minutes, all of the inmates on the row were cleared out of their cells, and the deputies searched each cell individually. The weapon was never found.

Cruz sustained multiple deep puncture wounds, mostly to his chest and back. He bled profusely from the wounds, making a puddle of blood inside his boxer shorts. Nurses and paramedics were summoned. The first nurse to arrive at the scene determined that he was in critical condition because of the blood loss and treated him to staunch the flow of blood and prevent him from becoming unconscious or going into shock. He was taken on a gurney to the jailhouse clinic and from there to the emergency room of a hospital where he received further treatment.

Cruz, whose moniker was "Moreno," was a member of the Cypress clique of the predominately Hispanic Avenues street gang (Avenues). Appellant, whose moniker was "Shadow" or "Shakey," was a member of another Hispanic street gang known as Krazy Ass Mexicans (KAM or Kamsters). On appellant's right arm was the tattoo "13," which reflected his allegiance to the Mexican Mafia. M is the 13th letter of the alphabet, and a "13" tattoo was one way for a Hispanic gang member to identify himself as a dedicated Mexican Mafia gang member.

Sergeant Richard Valdemar, who was assigned to the major crimes bureau of the sheriff's department, supervising the prison gang section, testified about the activities of the Mexican Mafia. He explained that the Mexican Mafia is both a prison gang and a criminal street gang, formed in 1956, and operating in prisons and jails. The Mexican Mafia controlled the activities of Southern California Hispanic criminal street gangs through intimidation and edicts (rules). Valdemar described how the Mexican Mafia orchestrated jailhouse murders, called "hits."

Representatives of the Mexican Mafia in each jail or prison enforced the rules, and the leader was called a "shot caller." Anyone who disrespected the rules of the Mexican Mafia was punished by being placed on a "green light" list, which identified the gang member by his name, moniker and gang affiliation. The Mexican Mafia issued the green light lists and communicated them to the shot callers in each institution, who then covertly distributed the lists or communicated them orally throughout the jail or prison. The lists were written on tiny pieces of paper and hidden in clothing or in a body cavity. The shot caller distributed the lists to the various modules and onto the rows of cells to representatives who passed them on down the row, bits of paper tied to a piece of thread ("a kite"), or words whispered through the vents.

One rule of the Mexican Mafia prohibited Hispanic gang members from fighting each other ("set tripping") when they were in custody. When an inmate was "green lighted," however, the ban against set tripping was lifted and it was "open season" on that inmate. An individual on the "personal hard candy" list was to be killed with a shank. "Hard candy" means a shank or a knife. Generally, if a person was on the personal hard candy list, he could not get off the green light list, regardless of what he did, until he was either killed or transferred to another custodial facility, where his name would appear on that facility's green light list.

The shot caller would devise a plan and select someone to carry out the "hit." An inmate designated to do a hit was then issued a weapon from the Mexican Mafia's custodial arsenal. Although jails are constantly searched for weapons, the Mexican Mafia is able to maintain an armory within the jail and to hide weapons in the vicinity of the planned attack. The shot caller assigned other inmates to act as lookouts and to dispose of the weapon afterwards. If a person who is assigned to commit a jailhouse murder does not succeed, or at least make a good faith attempt, then he will be put on the green light list himself for his act of defiance.

On March 2, 2002, Deputy Carpenter had found a green light list which described Cruz by his moniker, his name, his gang, and his clique within the gang. His name appeared on each of six other lists discovered between June 2001 and June 2003—every green light list recovered by deputies during that period. He was on the personal hard candy section of each of these lists.

Appellant did not present any evidence.

## DISCUSSION

1. *The Trial Court's Denial of a Continuance Was Not Abuse of Discretion*

Appellant contends the failure of the trial court to continue trial to allow more time to prepare a defense to the proposed testimony of Los Angeles Sheriff's Sergeant Valdemar deprived him of due process and his right to present a defense. We disagree. The record reflects that although the defense did not know the particulars of Valdemar's proposed testimony before the Evidence Code section 402 hearing (402 hearing), appellant, through his attorney, had ample notice that Valdemar was a prosecution witness and that he would be called to testify this was a classic jailhouse hit.

Valdemar testified at a lengthy 402 hearing on Friday, January 2, 2004, and concluded his testimony on Monday, January 5. He was examined, cross-examined, examined further on redirect, and cross-examined further. Afterward, the trial court announced its intent to defer ruling on the admissibility of Valdemar's testimony. On the fourth day of trial, after three witnesses had testified, appellant's attorney requested a continuance to interview potential defense gang experts.

He argued that he first heard about Valdemar on Monday or Tuesday of the previous week, when the prosecutor told him in a telephone conversation that she intended to call a gang expert to show the incident was "somehow gang-related." He added that was the first time he saw the "hit lists" the prosecutor had referred to and "got more information from her as to what she expected." After receiving a copy of an interview report by Deputy Jaime "which also purported to go to the gang evidence," he began "to get the idea where we were going with this. But I have not had any opportunity to explore it with any expert because we have only just heard the depth of the opinion and the basis for it given by the sergeant" at the 402 hearing.

The prosecutor asserted "much of what [appellant's] counsel said was just not true." She took "exception to the record he just made that the first he heard of this was a few days ago. He has in his possession the witness list that I mailed to him on December 11th. We had had discussions before that." She explained:

"On the 26th of November, which was 54 of 60, we had an in court appearance" and at that time, she related that she had just spoken with Valdemar "and that we were going to look for green light lists. I told [defense counsel] the substance of this that Sergeant Valdemar told me this was a classic hit in county jail, that I planned on negating the defense that was used in the first trial [i.e., the attack was intended to discipline, not kill Cruz]. But at that point, as I informed the court before, Sergeant Valdemar had told me get a hold of your guys at [Men's Central Jail], see if they have any green light lists, I'll bet you will find him on there. And I told [defense counsel] that that was being done.

"On December 11, I sent to counsel a . . . witness list, which included Sergeant Valdemar's name as witness number 10.

"Thereafter, on December 23rd . . . I spoke to [defense counsel] on the phone, and said I have some documents I want to show you, I have some things for you. He was here on the 30th [and] at that time—either at that time or before. I had given him Deputy Jaime's report. At that time, I showed him all four of the [green light] lists that I showed you in court. I explained to him that for security reasons, I was instructed not to distribute them, but that he could examine them for as long as he wanted. I just physically wasn't going to give him a copy. He seemed to have no problem with it. He announced ready that day. . . . Again, he was aware at this time of all this testimony."

Defense counsel did not dispute the prosecutor's account of her disclosures concerning Valdemar and the nature of his testimony. After acknowledging receipt on December 11 of the witness list, defense counsel pointed out the list did not "describe who [Valdemar] is and what he does."

The court responded that the People were not under any obligation to supply that information and "I don't know what else they could give you other than his name and put you on notice" of the evidence sought to be

presented. The court found that the prosecution gave adequate notice by disclosing Sergeant Valdemar's name "coupled with [the prosecutor's] conversations with you where she informed you of the green light list, and she . . . told you the gist of why he would be a relevant witness." In denying appellant's continuance motion as untimely, the court found "the People gave the defense adequate notice here of their intent" regarding Sergeant Valdemar's testimony and suggested appellant's counsel "start looking quickly" if he believed a defense gang expert were necessary.

■ "Both the Sixth Amendment of the federal Constitution and the due process guarantees of the state and federal Constitutions require that a criminal defendant receive notice of the charges adequate to give a meaningful opportunity to defend against them. (U.S. Const., 6th Amend. ['the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation']; *id.*, 14th Amend.; Cal. Const., art. I, § 15.) 'Notice of issues to be resolved by the adversary process is a fundamental characteristic of fair procedure.' (*Lankford v. Idaho* (1991) 500 U.S. 110, 126 [114 L.Ed.2d 173, 111 S.Ct. 1723]) 'The "preeminent" due process principle is that one accused of a crime must be "informed of the nature and cause of the accusation." [Citation.] Due process of law requires that an accused be advised of the charges against him so that he has a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial.' (*People v. Jones* (1990) 51 Cal.3d 294, 317 [270 Cal.Rptr. 611, 792 P.2d 643].)" (*People v. Seaton* (2001) 26 Cal.4th 598, 640–641 [110 Cal.Rptr.2d 441, 28 P.3d 175].)

■ " ' "The granting or denial of a motion for continuance in the midst of a trial traditionally rests within the sound discretion of the trial judge who must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion. In the lack of a showing of an abuse of discretion or of prejudice to the defendant, a denial of his motion for a continuance cannot result in a reversal of a judgment of conviction." ' [Citations.] Entitlement to a midtrial continuance requires the defendant 'show he exercised due diligence in preparing for trial.' [Citation.]" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1105–1106 [31 Cal.Rptr.2d 321, 875 P.2d 36].) Denial of a midtrial continuance is subject to an abuse of discretion standard. (*Id.* at p. 1106.)

Appellant's attorney did not dispute the prosecutor's recital of events leading up to the 402 hearing. This recital established that appellant knew the thrust of Valdemar's proposed testimony more than a month before trial and he received the prosecution's witness list naming Valdemar as a witness three

weeks before trial. Accordingly, appellant waived any right to a continuance to seek a gang expert by failing to request one earlier. (See *People v. Arias* (1996) 13 Cal.4th 92, 151 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

Additionally, appellant has failed to describe any actual prejudice flowing from the absence of a continuance. He argues prejudice "is shown by the fact that at the first trial Deputy Valdemar was not a witness and the jury hung on the attempted murder count with a vote of 8-4 for acquittal." This is not legally cognizable prejudice. To establish prejudice, a defendant must show affirmatively that in the absence of the claimed error (here, denial of his motion to continue made on the fourth day of trial), a result more favorable to him probably would have ensued. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Appellant argues, "there is a reasonable probability that the outcome . . . would have been different" if he had "been able to explore the credibility of Valdemar and find a gang expert to rebut some of Valdemar's more outrageous claims (such as his claim that he knew what every Hispanic inmate knew and saw every single day) . . . ." The record reveals appellant had ample opportunity, and exercised it fully, to cross-examine Valdemar's credibility during the 402 hearing and at trial. Moreover, he fails to specify in what way he was foreclosed from calling a defense gang expert in the absence of a continuance.

### 2. *Appellant's Intent Was Not the Subject of Expert Testimony*

Appellant contends admission of gang expert testimony about his knowledge and intent was prejudicial error. He argues Sergeant Valdemar's testimony to the effect that "*all* Hispanic gang members act in this way left no doubt that he was testifying appellant must have acted this way, therefore the testimony went to *appellant's* subjective intent and knowledge." The record does not support appellant's claim.

At trial, the prosecutor argued gang expert testimony was essential to demonstrate appellant's motive, because otherwise the stabbing would appear to be senseless. Appellant's attorney argued that Valdemar's testimony was tantamount to directing a guilty verdict on the attempted murder charge "even if he never says the magic words, he had the knowledge."

The court cautioned the prosecutor not to ask questions of Valdemar to elicit his opinion of appellant's knowledge and intent in violation of the proscriptions of *People v. Killebrew* (2002) 103 Cal.App.4th 644, 657 [126 Cal.Rptr.2d 876] (reversing judgment of conviction based on admission of improper expert testimony). The prosecutor stated she would not ask Valdemar any hypothetical questions based on "anything that could be

interpreted as asking his opinion with regard to the specific intent of the perpetrator in this case." Rather, she "just want[ed] to lay the foundation for this jury to understand all of the circumstances surrounding this attack."

The trial court thoroughly evaluated whether Valdemar's testimony was more probative than prejudicial (see Evid. Code, § 352) and concluded the evidence was highly probative since "a reasonable jury would go back there and say, why would he do this," and that it was "almost misleading not to put this event in the proper context." However, the trial court admonished the prosecutor not to inquire about any individual's knowledge or "mind set" and that Valdemar was not to testify to the effect that the Mexican Mafia's rules were "absolute and uniform."

■ "The admission of gang evidence over an Evidence Code section 352 objection will not be disturbed on appeal unless the trial court's decision exceeds the bounds of reason. [Citation.]" (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369 [37 Cal.Rptr.2d 596].) Since at least 1980, our courts have recognized that evidence of gang sociology and psychology is beyond common experience and thus a proper subject for expert testimony. (See *People v. McDaniels* (1980) 107 Cal.App.3d 898, 904–905 [166 Cal.Rptr. 12]; see generally *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1207–1209 [105 Cal.Rptr.2d 187] [defendant committed shooting to reestablish and bolster his gang reputation, reestablish the gang in the community, and send a message to the community and rival gangs]; *People v. Gardeley* (1996) 14 Cal.4th 605, 619 [59 Cal.Rptr.2d 356, 927 P.2d 713] [hypothetical attack based on facts of case was classic example of gang-related activity to intimidate residents]; *People v. Zermeno* (1999) 21 Cal.4th 927, 930 [89 Cal.Rptr.2d 863, 986 P.2d 196] [defendant's attack on victim was retaliation for earlier gang-related murder].)

■ The People are entitled to "introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent." (*People v. Funes* (1994) 23 Cal.App.4th 1506, 1518 [28 Cal.Rptr.2d 758].) "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." (*People v. Lopez* (1969) 1 Cal.App.3d 78, 85 [81 Cal.Rptr. 386]; see also *People v. Martin* (1994) 23 Cal.App.4th 76, 81 [28 Cal.Rptr.2d 660] [gang activity or membership admissible where "important to the motive . . . even if prejudicial"].)

■ Expert testimony repeatedly has been offered to show the "motivation for a particular crime, generally retaliation or intimidation" and "whether and how a crime was committed to benefit or promote a gang." (*People v. Killebrew, supra,* 103 Cal.App.4th at p. 657.) Appellant's reliance on *Killebrew* for a contrary conclusion is misplaced. In *Killebrew*, in response to

hypothetical questions, the People's gang expert exceeded the permissible scope of expert testimony by opining on "the subjective *knowledge and intent* of each" of the gang members involved in the crime. (*Id.* at p. 658.) Specifically, he testified that each of the individuals in a caravan of three cars knew there was a gun in the Chevrolet and a gun in the Mazda and jointly possessed the gun with everyone else in the three cars for mutual protection. (*Ibid.*) *Killebrew* does not preclude the prosecution from eliciting expert testimony to provide the jury with information from which the jury may infer the motive for a crime or the perpetrator's intent; *Killebrew* prohibits an expert from testifying to his or her opinion of the knowledge or intent of a defendant on trial. (*Ibid.*)

We conclude the trial court did not abuse its discretion in admitting the testimony of Valdemar, the People's gang expert. As appellant acknowledges, the prosecutor did not ask Valdemar any hypothetical question based on the facts of this case.[4] Valdemar's testimony did not embrace appellant's particular knowledge or his intent, specific or otherwise. Rather, his testimony addressed the motives of jailhouse gang members in general. This evidence, coupled with the evidence that appellant was a gang member, may have led the jury to the ineluctable conclusion that appellant intended to kill Cruz, but that does not render it inadmissible. (See, e.g., *People v. Olguin, supra,* 31 Cal.App.4th at pp. 1370–1371.) To the contrary, the expert testimony was crucial to the prosecution's theory of the case.

■ The law does not disfavor the admission of expert testimony that makes comprehensible and logical that which is otherwise inexplicable and incredible. Many in our community can imagine circumstances that might lead to a crime of passion, and many are familiar with the activities of gangs on the streets of Los Angeles County. But few among us know enough about the gang activities organized by the Mexican Mafia in Men's Central Jail to understand an inmate's cold-blooded attempt to murder a nearly naked, defenseless fellow inmate who did nothing to provoke the attack. The jury was instructed to try to arrive at a mutual understanding of the events portrayed by the evidence. Like the court in *People v. Olguin, supra,* 31 Cal.App.4th at page 1384, we find it "difficult to imagine a clearer need for expert explication than that presented by a subculture in which this type of mindless retaliation promotes 'respect.' "

---

[4] We do not conclude that it would have been improper for the prosecution to ask Valdemar hypothetical questions based on the facts of the case. A gang expert may render an opinion that facts assumed to be true in a hypothetical question present a "classic" example of gang-related activity, so long as the hypothetical is rooted in facts shown by the evidence. (*People v. Gardeley, supra,* 14 Cal.4th at pp. 618–619.)

### 3. The Attempted Murder Conviction Was Supported by Ample Evidence

Appellant contends his attempted murder conviction must be overturned, because the evidence was insufficient to show he possessed the requisite intent to kill. We conclude the evidence was ample.

■ The crime of attempted murder includes the element of intent to kill. (*People v. Visciotti* (1992) 2 Cal.4th 1, 56 [5 Cal.Rptr.2d 495, 825 P.2d 388].) "One who intentionally attempts to kill another does not often declare his state of mind either before, at, or after the moment he shoots. Absent such direct evidence, the intent obviously must be derived from all the circumstances of the attempt, including the putative killer's actions and words. Whether a defendant possessed the requisite intent to kill is, of course, a question for the trier of fact. While reasonable minds may differ on the resolution of that issue, our sole function is to determine if *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citations.]" (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945–946 [2 Cal.Rptr.2d 629].)

■ Valdemar's expert testimony provided substantial circumstantial evidence that appellant was commissioned by the Mexican Mafia to kill Cruz. In addition, appellant's intent was established by the evidence of his unprovoked attack that rendered the unarmed victim prone and defenseless as appellant repeatedly stabbed him with a shank he had hidden in his boxers. Appellant acknowledges that a factor indicating a killing is premeditated and deliberate is the existence of "wounds [which] were not wild and unaimed but were in the area of the chest and heart." (*People v. Paton* (1967) 255 Cal.App.2d 347, 352 [62 Cal.Rptr. 865].) He also acknowledges that in this case "the witnesses testified appellant hit Cruz perhaps twelve or thirteen or fourteen times rapidly in the space of 30 to 45 seconds" and that "Cruz suffered multiple puncture wounds to his left side on the front and back." He points out, however, "there was no injury to his heart or lungs" and argues the knife thrusts therefore were "not the specifically aimed attack referred to in *Patan* [*sic*]."

■ The fact that appellant missed Cruz's heart and lungs was fortuitous rather than indicative of the absence of an intent to kill. (See, e.g., *People v. Lashley, supra,* 1 Cal.App.4th at p. 945 [victim's escape from death due to "poor marksmanship" did not establish lack of intent to kill].) As we discussed above, the totality of the circumstances, including the manner of the attack and the number and location of the penetrating knife wounds, was sufficient to support a finding of intent to kill.

## DISPOSITION

The judgment is affirmed.

Hastings, Acting P. J., and Curry, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 8, 2005.