Filed 4/18/14  P. v. Torres CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B244672 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA095853) |
| v. | |
| ARTHUR FRANK TORRES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Bruce F. Marrs, Judge.  Affirmed.

Mark S. Givens, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson and Ryan M. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Arthur Frank Torres (defendant) was convicted of attempted murder and assault with a deadly weapon. The jury also found true allegations that he used a dangerous weapon and inflicted great bodily injury. After defense counsel presented the statement of a gang member who confessed to the crime, the trial court allowed the People to call a gang expert as a witness to demonstrate the member's alleged motivation to lie. The trial court prohibited defendant's grandmother from testifying that defendant was unable to run because of a medical condition, which defense counsel would have used to refute the People's theory that he had run from the scene of the crime. Defendant argues the court erred in these evidentiary rulings, requiring reversal. We disagree and affirm.

## FACTUAL AND PROCEDURAL SUMMARY

"We review the evidence in the light most favorable to the People and presume the existence of every fact the trier could reasonably deduce from the evidence that supports the judgment. [Citation.]" (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1543 (*Gonzalez I*).) The following summary is based on this appellate standard of review.

On September 9, 2011, Andre Rodriguez hosted a party on the occasion of his 21st birthday. The party was at a house on Millet Avenue in El Monte. During that evening, four uninvited men tried to enter the party. Defendant was not among them. After Rodriguez asked them to leave, one of the men yelled "Flores" before all four walked away. El Monte Flores is a criminal street gang. Defendant was a member, but Rodriguez was not. Sometime later, Ana Amor, Rodriguez's girlfriend, was standing in the driveway when she saw defendant and another man walking toward the party. She did not recognize them, so she asked if they knew anybody at the party. Defendant responded, "[s]hut the fuck up, you bitch," and continued walking toward the backyard. Amor noticed that defendant had a tattoo of the name "Priscilla" on his neck.

Sometime after 1:00 a.m. on September 10, Rodriguez was standing in the driveway when he saw defendant and another man exiting the backyard. Defendant told Rodriguez that he was having an issue with a party guest. Rodriguez agreed to speak to that person. As they talked, Rodriguez and defendant walked together down the

2

driveway and on the sidewalk in front of a neighboring house. The second man walked across the street and leaned against a parked car with license plates covered by newspaper. Rodriguez noticed that defendant's head was bald and that he had a tattoo of writing on the right side of his neck.[1]

After Rodriguez and defendant stopped talking, Rodriguez turned around and started walking toward the party. He was stabbed in the back. Rodriguez punched defendant, and looked back to the driveway where Amor had been standing. She yelled "watch out, watch out." Defendant then stabbed Rodriguez twice in the neck. As they fought, Rodriguez saw "something shiny" fall from defendant's hand. Amor also saw a "shiny object" slide under a parked car. The man leaning against the nearby car fired an "airsoft" gun at Rodriguez, hitting him on the left side of his temple and behind his ear.[2] After the shooting, Amor saw defendant and the man run southbound on Millet Avenue. Bleeding from his wounds, Rodriguez sought cover by a car, and then returned to the party once he determined it was safe to do so. After paramedics arrived, Rodriquez was transported to the hospital, where a detective briefly interviewed him. He was unable to identify a suspect or provide a physical description.

On September 12, Rodriguez's cousin told him about a school rumor that "Baby Tuff" had stabbed him. Rodriguez and Amor then searched for videos on the Internet relating to "Baby Tuff" and found one in which defendant rapped about "coming up and as a gang member" and displayed gang signs. Rodriguez recognized defendant's voice. At about this time, Rodriguez spoke with Amor, who described details of the stabbing and shooting as she observed them from the nearby driveway. Meanwhile, Amor downloaded a Facebook photo of defendant. She recognized him as the stabber. On

---

[1]      At trial, defense counsel argued that Rodriguez did not mention this tattoo observation in previous interviews with law enforcement, and raised it for the first time during his testimony. However, the People argued that the prior interviews (at the hospital and crime scene) were brief, and provided no opportunity to mention the tattoo.

[2]      Rodriguez testified that an "airsoft" gun is "like an actual gun, but they use a $CO_2$ tank to shoot metal BB's [*sic*]."

September 29, she and Rodriguez gave a printout of the photo and an Internet link for the video to a detective.

On September 30, Rodriguez was shown a six-pack photographic lineup by a detective, but did not identify his assailant. On October 4, he was shown another six-pack, and identified defendant as the assailant. Amor also identified defendant from a six-pack lineup. On March 8, 2012, Rodriguez was shown another six-pack, and was told that one of the men depicted had admitted to the stabbing. He did not identify his assailant from that display, and instead said that he already had identified defendant as the stabber. Amor also did not identify anyone from that photographic lineup.

Officers recovered a knife when they arrested defendant. His booking photo showed a neck tattoo of "Priscilla." In count 1, defendant was charged with attempted, willful, deliberate and premeditated murder (Pen. Code, §§ 664, subd. (a), 187, subd. (a)). It was further alleged that he committed that crime with the personal use of a deadly and dangerous weapon (Pen. Code, § 12022, subd. (b)(1)). In count 2, defendant was charged with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)). As to both counts, it was alleged that he personally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)). Defendant pled not guilty and denied the allegations.

Before trial began, defense counsel indicated that Antonio Gutierrez, who had admitted to the stabbing, might testify for the defense. The People said that if Gutierrez testified they would present rebuttal testimony about gang culture to show Gutierrez's motivation to lie. Defense counsel argued the rebuttal evidence would turn "this into a gang case." The court disagreed. It said that the culture and gang psychology could be "something that the average juror would be very interested in getting a theory on," and would be relevant to explain why a gang member would admit to a crime he did not commit. However, the court said the testimony "would have to be tailored and limited" to El Monte Flores's status as a criminal street gang, its unique culture, and how its members interact. Because defense counsel was unsure whether it would present Gutierrez's testimony, the court postponed the issue for later consideration.

4

Defendant did not testify at trial. His counsel presented four alibi witnesses. His girlfriend, Priscilla Ramirez, testified that in September 2011 she was living with defendant, her sister, and her two nephews. On September 9, she and defendant went to a hospital because she feared her pregnancy was in trouble. After they returned home in the early evening, Priscilla went directly to bed, following the physician's order for strict bed rest.[3] Defendant stayed with her throughout the weekend. Priscilla said defendant was not bald at the time. In support of Priscilla's testimony, defense counsel introduced a sketch of defendant that depicted him with hair. A machine at a Chuck E. Cheese restaurant had printed the sketch after capturing a photo of him on September 16, 2011. In addition, Priscilla's nephew, Robert Ramirez, testified that he stayed up late on the night of September 9, 2011 to play video games. He saw Priscilla and defendant return from the hospital and enter their room, but did not notice anybody leave the home that night. Viviann, Robert's mother, testified that no one had left the home that evening, which she knew because she slept on a couch by the door.

Defense counsel also called Maria Garcia, defendant's grandmother, to testify about his inability to run. When counsel asked her about defendant's health problems, the People objected on relevance grounds. During a sidebar, defense counsel argued that defendant had asthma, and Garcia would testify that he could not run any distance without stopping. She would describe his difficulties with physical activity that she had observed, without mentioning a medical diagnosis. Defense counsel argued this was relevant to show that defendant was not the stabber, since he could not have run from the scene, as Amor testified. The People claimed the proposed testimony concerning a medical condition went beyond the scope of Garcia's personal observations. The court agreed, and limited Garcia's testimony to exclude any mention of defendant's inability to run due to breathing problems.

Defense counsel also presented Dr. Mitchell Eisen, a psychologist, regarding the limits of perception and memory. He said witnesses use inferences, which are sometimes

---

[3]    We use first names for all people who share the surname of Ramirez.

inaccurate, to complete the inevitable gaps in memories. He described how traumatic events narrow a person's attention to detail. Regarding identifications, Dr. Eisen described a two-step process: first, recognition, then deliberation on whether the witness recognizes the face well enough to confidently make an identification. In addition, when witnesses talk to each other about an event, their memory reports begin to converge. After defense counsel presented Dr. Eisen with a hypothetical situation closely corresponding to Rodriguez's identification of defendant, the psychologist said Amor's finding defendant's photo on Facebook could have influenced Rodriguez's memory. He also indicated that both Amor and Rodriquez solidified their identifications of the suspect when they viewed the Internet video and Facebook photo.

Defense counsel decided to present Gutierrez's admission to the crime. A sheriff's deputy identified Gutierrez as a member of the El Monte Flores street gang. The parties stipulated that Gutierrez had suffered one felony conviction for possession of stolen property in March 2012. After the court found Gutierrez to be unavailable, having validly invoked his Fifth Amendment privilege, defense counsel presented Julian Sanderson, a private investigator retained by the defense, to testify about a statement that Gutierrez had made to him. Sanderson testified that Gutierrez said he had arrived at Rodriguez's birthday party on September 10. He was alone. Gutierrez had problems with other guests, so he looked for the host. Once he found Rodriguez, Gutierrez talked to him in front of the residence. Soon Gutierrez was surrounded by four men, and was punched twice in the head. Scared, he pulled out a knife and stabbed one of the men in the neck, then arm. After he heard a loud sound, Gutierrez thought there was a shooting, so he ran, was chased by a group of men, and dropped the knife on his way home. Gutierrez said he did not know defendant well, and only came forward because they were incarcerated together and he was upset that someone else had been charged with his act, which he claimed was committed in self defense. Sanderson was unable to locate Gutierrez's knife.

6

The court granted the People's motion to present rebuttal evidence in the form of testimony from detective Ralph Batres, an expert on the El Monte Flores gang. The People declined defense counsel's offer to stipulate that defendant and Gutierrez were both members of El Monte Flores. To illustrate Gutierrez's possible motive to lie, the People argued that Batres would testify about how gang members help each other by admitting to crimes committed by a fellow gang member. Defense counsel claimed the gang testimony would be unduly prejudicial, violate defendant's due process rights, and run afoul of Evidence Code section 1101,[4] which prohibits evidence of a person's character trait when offered to prove conduct on a particular occasion. The court said that testimony about gang culture was important to illustrate a possible motive to lie. Pursuant to section 1101, subdivision (b), the court allowed Batres to testify "solely for purpose of determining whether or not Mr. Gutierrez had a motive to fabricate or to lie" and not "as to whether or not . . . Torres is a bad person or had a predisposed tendency to commit a crime." The court also said that any criminal predicate acts of the gang were irrelevant.

Just before presenting its rebuttal testimony, the People requested permission to call Batres to testify about the gang's criminal culture to show why younger members may commit crimes to gain seniority. Defense counsel lodged a continuing objection to the entire line of questioning. The court said that "inherent within a discussion of any kind involving streets gangs is some discussion of what they do" but ruled that Batres should not focus on the predicate acts of the gang. Instead, he should describe "how the culture rewards things, [and] how the culture punishes things by an individual." Once again, the People declined defense counsel's offer to stipulate that defendant was a member of El Monte Flores. Before Batres took the stand, the court provided the jury with a limiting instruction: "[t]his evidence . . . may not be considered by you to prove the defendant's a person of bad character or that he has a disposition to commit crimes. It

---

[4] All further statutory references are to the Evidence Code, unless otherwise indicated.

7

may be considered by you only for the limited purpose of determining if it tends to show a motive for the statements to Mr. Sanderson by Mr. Gutierrez."

Batres testified that El Monte Flores has existed for over 70 years, demonstrated some of its gang signs, and described its typical tattoos. He said members join the gang by being beat up for a period of time ("jump[ing] in") or by being related to a former or current member, and that they remain affiliated until death. Batres said members must earn the right to wear gang tattoos by "put[ting] in work," such as selling drugs or committing crimes when more senior members tell them to do so. If gang members refuse, they would be beaten up or killed. Batres continued, "[t]hey are a violent criminal street gang, and they can cut the tattoo off of you" if a member does not earn the right to wear it. The court overruled defense counsel's objection to Batres's characterization of the gang as violent. Batres said younger gang members want to be accepted, so they would attempt to gain respect by being violent or committing crimes, even if they risk criminal punishment in doing so.

Batres said he knew Gutierrez from working on a case, reading police reports, and speaking with other officers. From this knowledge, and examining Gutierrez's tattoos, he concluded that Gutierrez was a member of El Monte Flores. Similarly, Batres testified that he knew defendant from other cases, reading reports, and viewing his tattoos. The court overruled defense counsel's objection to Batres's description of how he knew defendant. The court said, "just because he talked to an individual vis-a-vis a case, doesn't mean necessarily the individual he's talking to is a suspect, party of interest, defendant, or anything else."

Batres confirmed that defendant was a documented gang member, and had 12 tattoos, including the name "Priscilla" on his neck. Gutierrez had no similar neck tattoo. When Batres said that defendant's various monikers all included "Tuff," the court overruled defense counsel's general objection. Batres concluded that based on defendant's tattoos, he is more senior than Gutierrez, who wanted to earn the right to wear more tattoos. Defense counsel objected to this testimony as nonresponsive. The

8

court overruled the objection. Then Batres provided a hypothetical example of a younger ranking gang member who assumed responsibility for an act committed by a more senior member in order to earn respect.

The jury reached a guilty verdict on both counts, and found the special allegations to be true. Defendant filed a motion for new trial, contending his trial had been unfair in violation of his due process rights. He argued that admission of gang evidence was unduly prejudicial, and that the overall evidence was insufficient to support his conviction. The court denied his motion.

On count 1, the court sentenced defendant to 11 years to life with the possibility of parole. This included a three-year enhancement pursuant to Penal Code section 12022.7, subdivision (a) and one year pursuant to Penal Code section 12022, subdivision (b)(1). On count 2, the court sentenced defendant to six years in state prison, but stayed the term pursuant to Penal Code section 654. Defendant was awarded 420 days of custody credit, and 54 days for good conduct. The court further ordered that he pay restitution of $5,000, and various other fees. Defendant filed a timely notice of appeal.

## DISCUSSION

Defendant argues the trial court erred in allowing Batres's testimony regarding the violent and criminal culture of El Monte Flores, and in limiting his grandmother's testimony. He contends the court violated state evidentiary laws and his federal constitutional rights.[5]

---

[5] Before Batres testified, defense counsel lodged specific objections and a continuing objection to the entire line of his testimony. Counsel also raised intermittent specific objections during the examination. As a result, we consider all of defendant's evidentiary claims as preserved for appeal. (See *People v. Gonzalez* (2006) 38 Cal.4th 932, 945 (*Gonzalez II*) ["Although a party must object on the specific ground asserted on appeal (§ 353, subd. (a)), defendant's many objections, both before the witness testified and during the actual testimony, made reasonably clear he was objecting on grounds that included those raised on appeal."].)

# I

A court may properly admit gang evidence if it is logically relevant to a material issue in the case other than character, is within the scope of proper expert testimony, and is not more prejudicial than probative. (See *People v. Vang* (2011) 52 Cal.4th 1038, 1044 (*Vang*) [gang experts must not exceed the scope of their expertise]; *People v. Avitia* (2005) 127 Cal.App.4th 185, 192 [gang evidence must be relevant, not unduly prejudicial, and not improper character evidence].)

Evidence is relevant if it has "any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) When offered to show conformity with a person's character or trait on a particular occasion, character evidence is generally inadmissible. (§ 1101, subd. (a).) However, it is admissible when offered to prove a particular fact, such as motive, other than an individual's disposition to commit an act. (§ 1101, subd. (b); *Gonzalez I*, *supra*, 126 Cal.App.4th at p. 1550 ["The People are entitled to 'introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent.'"].) These restrictions do not apply to "the admissibility of evidence offered to support or attack the credibility of a witness." (§ 1101, subd. (c).) Instead, evidence offered to impeach a witness other than the defendant is governed by section 786, which allows evidence of character traits to prove "honesty or veracity, or their opposites . . . ." (§ 786.)

"Since at least 1980, our courts have recognized that evidence of gang sociology and psychology is beyond common experience and thus a proper subject for expert testimony. [Citations.]" (*Gonzalez I*, *supra*, 126 Cal.App.4th at p. 1550.) "'Under . . . section 801, expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." [Citation.] The subject matter of the culture and habits of criminal street gangs . . . meets this criterion.' [Citation.]" (*Vang*, *supra*, 52 Cal.4th at p. 1044.) However, gang experts may not "'testify[] to his or her opinion of the

knowledge or intent of a defendant on trial.'" (*Gonzalez II*, *supra*, 38 Cal.4th at p. 946 citing *People v. Killebrew* (2002) 103 Cal.App.4th 644, disapproved on another ground in *Vang*, at pp. 1047-1049.)

Finally, even if gang evidence is otherwise admissible as proper expert testimony on the group's culture, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.) "[T]he test for prejudice under . . . section 352 is not whether the evidence in question undermines the defense or helps demonstrate guilt, but is whether the evidence inflames the jurors' emotions, motivating them to use the information, not to evaluate logically the point upon which it is relevant, but to reward or punish the defense because of the jurors' emotional reaction." (*People v. Valdez* (2012) 55 Cal.4th 82, 145.)

We review a trial court's admission of rebuttal evidence, and its rulings to exclude evidence, for abuse of discretion. (*People v. Brown* (2003) 31 Cal.4th 518, 534 [admission of evidence reviewable for abuse of discretion]; *People v. Gurule* (2002) 28 Cal.4th 557, 656 [reviewing rebuttal evidence for abuse of discretion].) "A trial court's discretionary ruling under [section 352] '"must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]"'" (*People v. Williams* (2008) 43 Cal.4th 584, 634-635.) In addition, "state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439 (*Partida*) citing *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

A.      *Testimony on Gang Culture*

Defendant contends the court erred in permitting Detective Batres to demonstrate El Monte Flores gang signs, and to characterize the gang as violent. Specifically, he

11

argues the testimony that El Monte Flores members beat up and kill their own members, want to be known as violent, sell drugs and commit other crimes, and cut the tattoos off of their members, was improper character evidence as well as unduly prejudicial. Defendant also argues that Rodriguez's testimony about defendant's displaying gang signs in the Internet video was unduly prejudicial.

The trial court properly prohibited Batres's testimony on Torres's character pursuant to section 1101, subdivision (a), but allowed it to impeach Gutierrez. Although the point was not specifically addressed in the parties' briefs, it cannot be disputed that section 786 is the correct statute for determining the admissibility of the evidence with regard to Gutierrez. Pursuant to section 786, evidence of character traits relevant to honesty may be offered to attack Gutierrez's credibility. (See § 786.) Here, the gang culture evidence demonstrated Gutierrez's alleged dishonesty, and false admission to a crime in order to avoid punishment to his fellow gang members. The trial court did not err in allowing this testimony as it applied to Gutierrez.

Nor did the court abuse its discretion in finding the testimony of Batres sufficiently probative to overcome potential prejudice. The probative value of Batres's testimony was high. After Batres testified to the violent nature of the gang, the jury could reasonably infer that Gutierrez would be motivated to falsely confess in order to avoid negative consequences from his fellow members. As the trial court indicated, the jury could find it helpful to know about the gang dynamics that would cause a member to falsely confess to a crime despite the possibility of jail time. Batres's testimony helped the jury determine whether to credit Gutierrez's admission.[6] (See *Gonzalez II*, *supra*, 38 Cal.4th at p. 946 [officer testimony relevant to help jury decide which testimony was truthful, including identifications and admissions of defendant and later repudiations].)

The trial court took measures to ensure that potential prejudice from Batres's testimony did not substantially outweigh its probative value. It did not allow Batres to

---

[6] For the same reasons that demonstrate the evidence's probative value, defendant's challenge to the testimony as irrelevant, in violation of sections 210 and 350, fails.

12

testify about specific crimes of the gang, permitted details only where relevant to illustrate Gutierrez's alleged motive to lie, and instructed the jury to consider the evidence accordingly. (See *People v. Pearson* (2013) 56 Cal.4th 393, 414 ["We presume that jurors understand and follow the court's instructions."].) In *Gonzalez II*, a gang expert testified that if a gang member testified against a rival, the witness would suffer intimidation, and his "'safety would be in great jeopardy.'" (*Gonzalez II*, *supra*, 38 Cal.4th at p. 945.) The California Supreme Court found that the expert's testimony on gang-related witness intimidation was helpful in the jury's determination of whether to credit witness statements at trial. (*Id.* at p. 947.) As a result, the court held the expert's testimony was sufficiently probative to be admissible. (*Ibid.*) As in *Gonzalez II*, the court in this case properly found Batres's testimony probative to the jury's determination of whether to credit Gutierrez's admission. The court did not abuse its discretion in admitting the testimony pursuant to section 352.

Defendant contends the court failed to conduct any analysis of the testimony's potential prejudice and probative value. (See *People v. Paniagua* (2012) 209 Cal.App.4th 499, 519 [reviewing court may reverse trial court where it failed to conduct section 352 balancing of offered evidence].) However, the court identified the probative value of the evidence, and limited prejudice by restricting the scope of the testimony, at the pretrial conference and twice during the trial. At the pretrial conference, the court acknowledged defense counsel's argument that the testimony would turn the case into a gang case. In response, the court said that the predicate acts of the gang would not help the jury, but that other gang evidence might be relevant to explain Gutierrez's motive to lie. Before Batres took the stand, defense counsel argued that gang evidence beyond establishing membership would be more prejudicial than probative. The court considered the admissibility of the testimony "in terms of Evidence Code section 352[,]" and said the evidence would help a jury to understand Gutierrez's motive. The court again ruled that the criminal predicate acts of the gang would be irrelevant. Just before Batres took the stand, the court refused to allow the prosecutor to show the

13

tattoos of Gutierrez and defendant to the jury. The court discussed the relevance of evidence about how gang members join and interact with each other. We find no merit to defendant's argument that the court failed to conduct a section 352 analysis. (See *People v. Prince* (2007) 40 Cal.4th 1179, 1237 [inferring necessary showing that trial court properly engaged in a section 352 analysis, without expressly stating it did so, when it referred to the evidence's probative value].)

With regard to allowing Rodriguez's testimony about the Internet video in which defendant was seen using gang signs, the court did not abuse its discretion. Defense counsel raised a hearsay objection to the testimony regarding the video, but the court overruled it, agreeing with the People's assertion that this testimony was offered for identification purposes. The People presented the evidence to show that Rodriguez properly identified defendant, which defense counsel disputed. Also, the court took measures to limit any prejudice. After defense counsel objected on hearsay grounds, the court refused to allow Rodriguez to describe additional details about the content of the video. In addition, any prejudice resulting from the description of the gang signs was merely cumulative, as multiple witnesses later testified that defendant was a gang member. Under these circumstances, Rodriguez's limited testimony on the gang signs did not substantially outweigh the probative value of the identifying information.[7]

B.  *Testimony About Prior Cases*

Defendant argues the court abused its discretion in permitting Batres to testify that he knew defendant from prior cases, speaking with other officers, and reading police reports.

Batres did not testify to any prior acts. Instead, the court limited his testimony to "cases." In a sidebar, the court said "we're not doing crimes and we're not going into details on the case, whatever the case is that he worked on. . . . [H]is contacts with people who are witnesses and people who are victims . . . doesn't mean necessarily the

---

[7]     Defendant did not challenge Rodriguez's testimony about the Internet video as improper character evidence. In any case, the court properly admitted it under the section 1101, subdivision (b) exception to prove defendant's identity.

individual he's talking to is a suspect, party of interest, defendant, or anything else." As a result, Batres said he knew defendant from "a case that [he] was investigating." Without testimony to specific acts, or other character evidence, the prohibitions of section 1101, subdivision (a) do not apply.

Nor did the court abuse its discretion in admitting Batres's testimony on how he knew defendant. As we have discussed, Batres's testimony was probative to Gutierrez's motive to lie. Evidence of how Batres's familiarity with defendant was necessary to establish a foundation for his further testimony supporting an inference that Gutierrez was motivated to lie. Without that foundation, it would be improper for Batres to have testified, for example, on the gang seniority of defendant compared to Gutierrez. Also, the court limited possible prejudice by restricting Batres's language to "case" instead of "crime." As the court described, the jury could infer that defendant was a witness or an innocent party. Any inferences of prejudice did not substantially outweigh the probative value of establishing Batres's foundation to comment on gang culture that allegedly motivated Gutierrez's false admission.

C. *Testimony on Gutierrez's State of Mind*

Defendant argues the court erred in permitting Batres to testify that Gutierrez wanted to climb the ranks within his gang. He claims it was improper for Batres to describe Gutierrez's particular state of mind.

Any error in the court's ruling to allow Batres's testimony on Gutierrez's state of mind was harmless. (See *Watson*, *supra*, 46 Cal.2d at p. 836.) Batres first illustrated the gang's culture by describing how members seek to attain greater respect. They do whatever they are asked to do, including providing false testimony. Batres properly testified in general terms about the motivations and culture of gang members. (See *Gonzalez II*, *supra*, 38 Cal.4th at p. 946 [finding testimony proper where expert responded to hypothetical questions].) Batres's further testimony that Gutierrez would do whatever it takes to earn the right to wear more tattoos could have been taken as an opinion of Gutierrez's state of mind. (See *ibid.* [impermissible to testify on expert's own

15

speculation and assumption].) The purpose of Batres's testimony was to provide information by which the jury could infer that Gutierrez had a motive to falsely confess to the attack. In testifying specifically to Gutierrez's desire to move up the ranks, Batres's testimony was consistent with his more general statements about gang culture that supported the same jury inference. There is no indication that the outcome would have been any different had Batres been prohibited from testifying about Gutierrez's intent, given other evidence that gang culture motivated his false admission.

II

Defendant argues the court erred when it prohibited Garcia, defendant's grandmother, from testifying regarding his inability to run because of breathing problems. He contends her testimony would have refuted the People's evidence that he was the person who had stabbed Rodriguez.

The record is not adequately developed as to what Garcia had seen and the circumstances under which she made her observation. Defense counsel offered that she would testify as to "what happens when he physically exerts himself," including how he had to stop and sit down after running short distances. The court said her observations were "ad hoc[]." Assuming the court should have inquired further, or that defense counsel should have provided a more robust offer of proof, the question becomes whether not doing so undermines the court's ruling. Any potential evidentiary error in the court's exclusion of Garcia's testimony was harmless. Defendant fails to demonstrate how it is reasonably probable that the outcome of his trial would be different had his grandmother testified that he was unable to run in previous unrelated situations. (See *People v. Richardson* (2008) 43 Cal.4th 959, 1001, quoting *Watson*, *supra*, 46 Cal.2d at p. 836 [*Watson* harmless error standard applies in cases of erroneous admission or exclusion of evidence].) At most, Garcia would have been able to testify that on some prior occasions, defendant was unable to run without tiring easily. The People presented ample evidence to support their argument that defendant was the assailant. Amor and Rodriguez provided two eyewitness identifications, and police found a knife in the home when they

arrested defendant. In light of this evidence of defendant's guilt, the court did not prejudicially abuse its discretion in limiting Garcia's testimony.

## III

Defendant claims his rights to due process and a fair trial, as provided by the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution, were violated when the court admitted allegedly prejudicial gang evidence, allowed Batres to testify about knowing him from a prior case, and prohibited Garcia from testifying about his inability to run.

"A defendant has the general right to offer a defense through the testimony of his or her witnesses [citation], but a state court's application of ordinary rules of evidence— including the rule stated in Evidence Code section 352—generally does not infringe upon this right [citations]." (*People v. Cornwell* (2005) 37 Cal.4th 50, 82, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421.) "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*. [Citations.]" (*Partida*, *supra*, 37 Cal.4th at p. 439.)

Here, there is no indication that the court's routine application of evidentiary rules rises to the level of fundamental unfairness. Defense counsel was permitted to present several alibi witnesses, and the admission of Gutierrez, to show that defendant was not guilty. In contrast, the evidence of defendant's guilt included two eyewitness identifications. Under these circumstances, we cannot conclude that the trial was so fundamentally unfair, if unfair at all, so as to deprive defendant of his constitutional rights.

## IV

Defendant claims that even if independently harmless, the court's errors rendered his trial fundamentally unfair, and rise to the level of reversible and prejudicial error. We found no court error in allowing Batres's testimony on gang culture and about prior cases. Also, we concluded that to the degree that the court permitted Batres's testimony about Gutierrez's state of mind, and prohibited Garcia from testifying, any error was

harmless.  By rejecting defendant's claims, we find no reason to reverse the court's judgment.  (See *People v. Avila* (2006) 38 Cal.4th 491, 608 [rejecting all of defendant's specific claims "necessarily forecloses his claim of cumulative error"].)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

EPSTEIN, P. J.

We concur:

WILLHITE, J.

EDMON, J.*

_____

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section  6 of the California Constitution.