Filed 7/31/14  P. v. Perez CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B246331 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA383777) |
| v. | |
| RAFAEL ALEJANDRO PEREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County,
Laura F. Priver, Judge.  Reversed in part, affirmed in part, and remanded with directions.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant
and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney
General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and
David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Rafael Alejandro Perez (appellant) appeals from the judgment entered following a jury trial resulting in his conviction of second degree murder (Pen. Code, 187, subd. (a)) with true findings he had personally used and discharged a firearm, proximately causing great bodily injury and death (Pen. Code, §§ 12022.53, subds. (b), (c) & (d)). The jury also found true the offense was committed for the benefit of a criminal street gang within the meaning of Penal Code section 186.22, subdivision (b)(1)(C).[1]

The trial court sentenced appellant to an aggregate term in state prison of 40 years to life, consisting of 15 years to life for the murder, enhanced by a term of 25 years to life for the discharge of a firearm proximately causing death.

## CONTENTIONS

Appellant contends (1) the evidence is insufficient to support a gang enhancement; (2) the trial court erred by imposing and staying the 10-year term for the gang enhancement pursuant to section 186.22, subdivision (b)(1)(C), in lieu of imposing the minimum 15-year term provided for in section 186.22, subdivision (b)(5); (3) the abstract of judgment improperly states appellant was convicted of first degree murder; and (4) appellant is entitled to 638 days of section 2900.5 presentence custody credit.

The contention the evidence is insufficient to support the gang enhancement lacks merit. Otherwise, we will reverse the orders of sentencing specified as error by appellant and remand the matter with directions for resentencing.

## BACKGROUND

We view the evidence in the light most favorable to the judgment. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

At about 8:25 p.m. on March 5, 2011, 18-year-old Tony Aragon (Aragon) left his Los Angeles residence on foot to go to a party. According to his mother, he was a "Barrio Mojado" or "BMS" gang member. In front of his residence, he met a female friend and walked to the nearby Moises Mini Market at Ascot and Vernon Avenues.

---

[1]    All further references are to the Penal Code unless otherwise specified.

As Aragon was crossing the street in front of the market, another youth approached him in the crosswalk from the direction of the market.

Aragon pushed his female friend to the side and put up his fists. The approaching youth was appellant, a rival "Ninos Surenos" or "NSU" gang member. Appellant took a handgun out of his pocket, said, "NSU," and continued to walk in Aragon's direction. Appellant shot at Aragon five times, then fled. Aragon was wounded and ran southbound on Ascot Avenue about 50 yards, then fell to the ground. Aragon lay there until assistance arrived.

Aragon was transported to the hospital. He died. At trial, a deputy medical examiner testified the cause of death was multiple gunshot wounds, one to the right shoulder and upper arm and another to the torso, head and neck.

Homicide detectives, Los Angeles Police Officer Thomas Brown (Officer Brown) and his partner, Officer Dan Gersna (Officer Gersna), responded after the shooting. In the intersection where the shooting occurred, Officer Brown observed .9-millimenter shell casings in the north east-west crosswalk. In the west north-south crosswalk, a steak knife was lying in the roadway. Fifty yards away, where Aragon had fallen, there was blood on the roadway. There was gang graffiti in the area. On a recently repainted market wall, Officer Brown observed the graffiti "BMS 47th Street." That graffiti was crossed out and replaced with "NSU 13."

The market's owner witnessed the shooting. He testified Aragon frequented the market. Earlier that day, at noon, he had seen a hostile confrontation between Aragon and two youths on bicycles. When the two youths had bicycled off, they yelled, "F--- BMS."

At about 8:30 p.m. that evening, the market's owner heard appellant outside the market getting a telephone number from a female bystander. At trial, that bystander testified appellant spoke to her in front of the market immediately before the shooting. Five minutes later, the market's owner heard shots outside the market.

3

Aragon's mother, Laurencia Isidoro, testified she had followed Aragon when he left the family residence. She was concerned for his safety. She observed the shooting from some 50 feet away. Before Aragon had left home, she had frisked him to make sure he was unarmed. She said she saw appellant walk across the crosswalk and shoot at her son. Her son did not have a weapon or firearm and did not provoke the attack.

Two months before the instant shooting, there was another gang shooting on the same corner. NSU gang member Rafael Vela, also known as "Menace," was shot by BMS gang member "[B]ig [M]ac."

Following Aragon's shooting, Officers Brown and Gersna interviewed appellant. Prior to the interview, appellant was advised of, and waived, his *Miranda* rights. (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).)

After three hours of denying any involvement in the shooting, appellant admitted he went to the market for a "blunt" (a cigar) to use to smoke marijuana. He saw a woman outside the market and asked for her telephone number. He claimed that while he was "picking up a girl's number," some "fools—pop[ped] up behind [him]" and asked him "where you from." He ignored them, but Aragon came up "real hard," challenging him. Appellant had a firearm as he was aware Menace had been shot there in an earlier gang shooting. Appellant claimed he did not know who Aragon was, but he "still took it out on him." He shot Aragon with his .9-millimenter handgun. When appellant shot Aragon, he was with Edgar Arroyo (Arroyo), who is also known as "Slugger" or "Bimbo."

Appellant added that when he pulled out his firearm, he said, "NSU," and Aragon froze. Aragon never claimed his neighborhood. Then Aragon reached for a pocket, causing appellant to believe Aragon was armed with a firearm or a knife. Appellant got scared and shot to "scare" off Aragon. Appellant closed his eyes and shot. He claimed he did not want to kill Aragon. He shot only when he saw Aragon with an item he believed was a chrome pistol. He did not want to fight as he was unaware where Aragon was from.

4

Officer Brown testified appellant told him appellant was accompanied to the shooting site by Arroyo. Appellant identified Arroyo as another NSU gang member.

During the trial, Officer Rene Santos (Officer Santos) from the Los Angeles Police Department Newton Gang Enforcement unit, testified as a gang expert. His testimony provided most of the information necessary to support the gang enhancement and to demonstrate motive. At the conclusion of his testimony, the prosecutor asked Officer Santos two hypothetical questions. The questions incorporated the approximate facts of the instant shooting. The officer opined that regardless of whether Aragon was acting in self-defense, the shooting was committed for the benefit of a criminal street gang.

Appellant declined to testify. In defense, trial counsel argued self-defense in conformity with appellant's statement to the police.

The parties stipulated that at no time prior to trial did appellant's mother disclose to the authorities that she had frisked her son prior to the time he left the family residence.

## DISCUSSION

1. *Sufficiency of evidence supporting the gang enhancement.*

Appellant contends the evidence fails to support the jury's true finding with respect to the gang enhancement.

   a. *Background.*

      (1) *Gang mores and gang culture generally.*

Officer Santos testified that within the world of gangs, reputation is important. To maintain a gang's reputation, gangs must be violent and commit violent crimes to keep the community in fear of them. Keeping the community in fear of the gang is important as the gang wants to create within their territory a sphere in which gang members can act with impunity. If the persons in the community are afraid to report crime, the offenses the gang commits will go unnoticed by the authorities.

5

"Respect" defines a gang member's status within the gang. Respect is actually how much others, gang members and community members, fear a particular gang or gang member. It is important that rival gang members fear the gang. If rival gang members are afraid to reveal their identities when they are challenged, this gives a gang member more respect. Gang members gain respect by putting up graffiti, bragging about their crimes and committing crimes in the community.

Putting up graffiti establishes gang territory. It also tells others the gang putting up the graffiti is not afraid to invade others' territory to write on a rival gang's walls.

Gang members threaten witnesses and victims. By doing so, they gain respect and create fear in the community. In communities with gangs, victims and witnesses to crimes are reluctant to cooperate with the police. When witnesses live in the community where a crime occurs, they are afraid to testify at trials. Cooperating with the authorities is punished by violent retaliation from gang members.

Rival gang members purposely "disrespect" one another. They cross out one another's graffiti. On the Internet, they blog about gangs, call other gangs names and claim one gang is better than another. They shoot at one another's residences and at one another. Once one gang "disrespects" another, the disrespected gang is expected to retaliate with violence. Retaliation need not occur immediately; often a rival gang will wait until they have a good opportunity for retaliation. The gang members have good memories; they don't forget an act of "disrespect."

Gang tattoos are important in the gang world. The tattoos demonstrate pride in the gang, and gang members are proud of their gang. One has to earn the right to have a gang tattoo; nonmembers do not display gang tattoos. To do so is regarded as an insult to the gang. Gang members will beat up, stab or shoot a nonmember who gets a gang tattoo.

Gang members commit crimes individually and in groups. A gang member might commit a gang shooting where he is the only gunman. But often other gang members go along to act as lookouts or drivers or for the purpose of corroborating the act of violence actually occurred.

"Snitching" is reporting information or a gang crime to the authorities. Even rival gang members will not disclose information and crimes by other gangs to the police. Avoiding cooperation with the authorities is a part of the gang culture.

Territory is the area a gang claims within its community. It is a gang's safe haven. Most of them live and feel secure in their own area. They sell their drugs in that area and make money for the gang.

Committing a violent assault against a rival gang member benefits an individual gang member. It upgrades the gang member's status within the gang; i.e., the gang member is then viewed as a powerful person within the gang. Other gang members and rival gang members will fear and respect the gang member. The commission of a violent act against a rival gang member benefits the gang as it causes rival gang members and community members to fear that gang member. If the gang is feared by rival gang members, then a gang's status is enhanced.

Inquiries such as "Where are you from?" are inquiries into a person's gang membership. The inquiry is a gang challenge. There is no good reply to the inquiry. In many instances, the question is merely a prelude to violence. A slang term for asking the where-are-you-from question to another person is "hitting up" the person. Sometimes, the person addressed with the inquiry is permitted to walk away. Other times, the challenge is a prelude to a fist fight or a shooting. On some occasions, an assailant yells out his gang name prior to the act of violence. In that way, the victim is aware of the assailant's gang membership. It is also the assailant's way of claiming the shooting for the benefit of the gang. The identification of an assailant's gang will be heard not only by the victim but also by any community members who happen to witness or hear about the shooting.

7

Officer Santos explained if there is a gang shooting, he would expect a retaliatory shooting to follow.

(2) *The Ninos Surenos or NSU gang.*

The NSU gang originated in the early 1990's in Los Angeles around the area of the Los Angeles Memorial Coliseum. It has branched out into areas such as South Central Los Angeles and San Bernardino. The gang has grown since its inception. At the time of trial, the gang had approximately 34 members. The gang is located in the local area in which Officer Santos works, and he personally knows its members. Officer Santos had personally investigated at least three shootings that occurred in NSU territory in which BMS was also involved. NSU does not have colors or special clothing. The officer explained currently, gang members do not want to be easily identified or to have the police know who they are. NSU has three cliques, each in a different part of the city.

The 58th Street clique lives in the area of 58th Street and Hooper Avenue. The common gang sign is the letter N. Gang members make the sign by manipulating their hands and fingers to portray the letter N. They use the letters NSU in their graffiti. Other areas the NSU gang claims are at Hooper Avenue and 43rd Street and Hooper Avenue and 77th Street. NSU regard all the gangs operating around them as rival gangs. For the most part, NSU has issues with the Barrio Mojado or the BMS gang. Other rival gangs include the 38th Street Playboys, the Hooper gang, and the Vernon Locos.

NSU's primary activities are carrying concealed firearms, vehicle theft, painting graffiti (vandalism), assaults with firearms, attempted murder, murder and narcotics trafficking. Louis Matias, a NSU gang member, was convicted in 2009 of assault with a deadly weapon. Julio Martin Lopez, another NSU gang member, was convicted on February 23, 2009, for taking and driving a vehicle in violation of Vehicle Code section 10851. Josue Sanchez, another gang member, was convicted in 2006 of carrying a concealed firearm.

8

(3) *Rivalry between NSU and BMS.*

BMS territory includes the area between Vernon and Slauson Avenues and Compton and Central Avenues. BMS claims the area around Vernon and Ascot Avenues.

BMS and NSU have participated in an on-going feud. They commit crimes against one another. Each gang commits assaults and shootings, and they shoot at one another frequently. They cross out one another's graffiti, which is disrespectful to the rival gang. In the photograph of the graffiti on the market at Vernon and Ascot Avenues, it appears NSU has been disrespectful to BMS by crossing out the BMS's graffiti. (The symbol "13" in "NSU 13" indicates NSU's alliance with the Mexican Mafia.)

Before testifying, Officer Santos had examined the field identification cards for BMS gang member Tony Aragon. He identified other NSU graffiti in the area of the shooting that was disrespectful to BMS.

Officer Santos knew appellant personally. During the officer's testimony, he showed the jury a photograph of appellant's NSU gang tattoos. The officer also had a photograph depicting appellant displaying his gang's sign, N. The officer testified appellant had admitted NSU gang membership to Officer Santos. In the officer's opinion, appellant was a NSU gang member.

During cross-examination, Officer Santos speculated that the instant shooting may have been retaliatory as appellant was the victim of a shooting several months ago. The officer said that generally, committing a crime in front of other gang members enhances a gang member's reputation.

(4) *The expert's opinion.*

After eliciting the foundational information supporting an expert gang opinion, the prosecutor addressed Officer Santos with a hypothetical containing facts similar to those involved in the instant shooting. The officer replied that the shooting would be of benefit to the gang. The gang would be looked upon as a powerful and dangerous rival by committing the shooting as one of its gang members had demonstrated a disregard for

9

human life.  The result of the shooting would be that the community would then fear the gang.

Officer Santos opined that this shooting also may have been an instance of retaliation for an earlier BMS gang shooting that had occurred several months previously.  Officer Santos explained the reason for his conclusion.  Such shootings make it easier for a gang to operate in their community.  When community members fear they might be the victim of gang violence, they do not report crime.  That makes it easier for the gang to commit new crimes.

A gang member also benefits individually by committing such a shooting.  His status within the gang is elevated.  He is viewed as a powerful member of the gang.  The community regards the assailant with fear knowing he is capable of violence.

The prosecutor modified his original hypothetical.  He asked Officer Santos whether his opinion would be the same if the gang member had acted in self-defense.  The officer replied that whether or not the shooting was committed in self-defense, it would be of benefit to the gang for the reasons he had previously outlined.

b.  *The relevant legal principles.*

(1)  *The standard of review for sufficiency of the evidence.*

In considering a challenge to the sufficiency of the evidence to support an enhancement, " ' "we review the [entire] record in the light most favorable to the judgment to determine whether it [contains] substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]" ' " (*People v. Wilson* (2008) 44 Cal.4th 758, 806.)  We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.  (*Ibid.*)  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)  " 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'  (*Ibid.*)" *(People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).)

10

Substantial evidence includes circumstantial evidence and the reasonable inferences this evidence allows.  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11; *People v. Ferraez* (2003) 112 Cal.App.4th 925, 930 (*Ferraez*).)  "Although the jury is required to acquit a criminal defendant if it finds the evidence susceptible of two reasonable interpretations, one of which favors guilt and the other innocence, it is the jury, not the appellate court, which must be convinced of his guilt beyond a reasonable doubt." (*People v. Millwee* (1998) 18 Cal.4th 96, 132.)

(2)  *The other relevant legal principles.*

Section186.22, subdivision (b)(1), is an enhancement which provides "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, [be punished] in addition and consecutive to the punishment prescribed for the felony or attempted felony of  which he or she has been convicted . . . ."  (§ 186.22, subd. (b)(1).)

"[T]to fall within the statutory definition of a 'criminal street gang,' there must be an ongoing association of at least three persons that has as one of its primary activities the commission of specific types of criminal activity, uses a common name or identifying sign or symbol, and has members who individually or collectively have actually engaged in 'two or more' acts of specified criminal conduct committed either on separate occasions or by two or more persons."  (*People v. Gardeley* (1996) 14 Cal.4th 605, 623 (*Gardeley*).)

The gang enhancement does not punish mere gang membership.  (*Gardeley*, *supra*, 14 Cal.4th at p. 623.)  To be punishable pursuant to section 186.22, subdivision (b)(1), the offense must be "gang-related," i.e., it must be committed (a) for the benefit of, (b) at the direction of, or (c) in association with a criminal street gang.  (*Albillar*, *supra*, 51 Cal.4th at p. 60.)  The second prong of the gang enhancement requires a defendant commit the gang-related felony with the specific intent to promote, further, or assist in *any* criminal conduct by gang members -- including the current offenses -- and not merely *other* criminal conduct by gang members.  (*Id*. at p. 65.)  There is no statutory

11

requirement this " ' "criminal conduct by gang members" be distinct from the charged offense, or that the evidence establish specific crimes the defendant intended to assist his fellow gang members in committing.' [Citation.]" (*Id*. at p. 66.)

The disjunctively worded subparts of each element provide separate and alternative means to satisfy the two statutory elements. (*People v. Leon* (2008) 161 Cal.App.4th 149, 162.)

A gang-related felony is required for the initial prong of the enhancement, but not for the latter specific intent prong. "There is no further requirement that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*." (*Albillar, supra,* 51 Cal.4th at p. 67.) Gang membership is not a requirement for the enhancement; the defendant is liable where a defendant "personally commit[s] a gang-related felony with the specific intent to aid members of that gang." (*Id*. at p. 68.)

"There is rarely direct evidence that a crime was committed for the benefit of a gang. For this reason, 'we routinely draw inferences about intent from the predictable results of action. We cannot look into people's minds directly to see their purposes. We can discover mental state only from how people act and what they say.' [Citation.]" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 411-412.) Thus, circumstantial evidence of specific intent is sufficient. Additionally, if substantial evidence otherwise establishes that the offense is gang-related, the jury reasonably may infer that the defendant had the specific intent to promote, further, or assist any criminal conduct by gang members. (*Albillar, supra*, 51 Cal.4th at pp. 67-68.)

(3) *Expert opinion.*

In *People v. Garcia* (2007) 153 Cal.App.4th 1499, at pages 1512 to 1513, the court summarized the general rules concerning the use of expert police officer opinion evidence for proving a gang enhancement.

" 'As a general rule, a trial court has wide discretion to admit or exclude expert testimony. [Citations.] An appellate court may not interfere with the exercise of that discretion unless it is clearly abused. [Citation.]" ' (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506 (*Valdez*).) In cases where a gang enhancement is alleged or a substantive gang crime is charged, expert testimony regarding the "culture, habits, and psychology of gangs" is generally permissible because these subjects are " 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*Ibid*.) For example, an expert may properly testify about the size, composition, or existence of a gang; "motivation for a particular crime, generally retaliation or intimidation"; and "whether and how a crime was committed to benefit or promote a gang." (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 656-658 (*Killebrew*), disapproved on another point in *People v. Vang* (2011) 52 Cal.4th 1038, 1047 (*Vang*); see *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550 (*Gonzalez*) ["Expert testimony repeatedly has been offered to show the 'motivation for a particular crime, generally retaliation or intimidation' and 'whether and how a crime was committed to benefit or promote a gang' "]; *Valdez,* at pp. 507-509 [holding expert opinion concerning whether the defendant acted for the benefit of a gang was admissible under the circumstances of the case].)

Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise an inference that the conduct was committed for the benefit of a criminal street gang. (*Albillar*, *supra*, 51 Cal.4th at p. 63, citing *People v. Vazquez* (2009) 178 Cal.App.4th 347, 354 [relying on expert opinion that the murder of a non-gang member benefited the gang because "violent crimes like murder elevate the status of the gang within gang culture and intimidate neighborhood residents who are, as a result, 'fearful to come forward, assist law enforcement, testify in court, or even report crimes that they're victims of for fear that they may be the gang's next victim or at least retaliated on by that gang . . .' "] and *People v. Romero* (2006) 140 Cal.App.4th 15, 19 [relying on expert opinion that "a shooting of any African-American men would elevate the status of the shooters and their entire [Latino] gang"].)

13

It is improper for an expert to express an opinion on the guilt or innocence of the defendant.  (*Vang*, *supra*, 52 Cal.4th at pp. 1048 & fn. 4, 1049-1052 [setting out the limits of opinion testimony concerning whether the criminal act was of benefit to the gang]; see also, *Gonzalez*, *supra,* 126 Cal.App.4th 1539, 1550-1551.)   Expert testimony with respect to whether a crime is gang-related is admissible.  (*Vang, supra*, 52 Cal.4th at p. 1050 & fn. 5.)

   c. *The analysis.*

  Appellant makes a shotgun contention, essentially claiming the evidence in the record about the shooting and based on the officers' personal knowledge was insufficient to show this was a gang-related shooting, questioning the propriety of certain foundational testimony given by Officer Santos supporting his opinion the shooting was of benefit to the gang and to the gang member, and questioning whether the record discloses appellant's companion at the time of the shooting, Arroyo, was a gang member.  Appellant asserts the evidence he and Aragon belonged to rival gangs alone does not support the enhancement and Officer Santos's general opinion committing a shooting against a rival criminal street gang shows a benefit to the gang fails to demonstrate appellant committed the shooting for gang purposes.  He questions whether the evidence demonstrates appellant committed the shooting with the specific intent to aid members of his gang.

  We disagree.  The details of the shooting as disclosed by the trial evidence establish an ample basis for the jury's finding the murder was committed for gang purposes.  Officer Santos's testimony described the NSU gang and its territory and criminal purposes.  He testified from personal knowledge, as did Officer Brown, that there was a long established rivalry between NSU and BMS.  Appellant admitted to Officer Brown in his statement to the police he was an NSU gang member, as well as admitting he was accompanied to the market by Arroyo.  Officer Brown testified appellant told him Arroyo, the companion, was also an NSU gang member.  Aragon's mother admitted Aragon was a BMS gang member.  Gang graffiti on the market's wall

showed NSU had crossed out rival BMS graffiti.  There was other graffiti in the area disclosing the gangs' rivalry.

The NSU-BMS gang rivalry was evidenced by the repeated NSU-BMS shootings in BMS territory and at the market, including at least one recent shooting by BMS of another NSU gang member named Menace.  Appellant admitted he was carrying a gun at the market because he was aware Menace was shot there.  Appellant apparently had been shot himself in another gang shooting within the last few months prior to the Aragon shooting. The record fails to state whether this also was a BMS shooting.  Appellant's claims the instant shooting was predicated by where-are-you-from inquiries and appellant's unsupported assumption Aragon was armed provide further proof this was an unprovoked gang shooting between gang rivals.

Appellant claimed in his statement he was unaware of Aragon's gang membership, but this bit of evidence does not unequivocally show the instant shooting was unrelated to a gang.  Aragon's presence in his own gang territory could have caused appellant to conclude Aragon was likely to be a BMS gang member.  And matters of credibility are left to the jury.  Further, the market owner testified to a noon confrontation between Aragon and other youths who yelled, "F--- BMS," as they rode away on bicycles after a hostile confrontation.  This latter confrontation provides circumstantial evidence NSU gang members may well have been lying in wait for Aragon or any other BMS gang member to go to the market in order to commit an act of violent retaliation.

Officer Santos testified as an expert to the violence between these local criminal street gangs and that retaliation fed a cycle of feuding that led to repeated rival gang shootings.  The market owner testified to repeated shootings at his location.  Officer Santos testified that such rival gang shootings and gang violence enhanced gang member status and fear of a gang.  The fear created by violent and criminal conduct by gang members keeps gang communities intimidated and prevents cooperation with the authorities so a gang can perpetuate their lives of crime.

15

Appellant admitted to Officer Brown he committed the shooting and that he had uttered his gang name, "NSU," immediately prior thereto. That evidence alone is sufficient to demonstrate a gang-related murder.

Appellant's claim of his neighborhood, "NSU," at the time of the shooting circumstantially reveals his gang-related intent. His companion Arroyo's presence at the time of the shooting also demonstrates this intent. Officer Santos testified that gang members often accompany one another to a shooting for the purpose of corroborating the gang members commission of the act or for the purpose of acting as a lookout. The officer testified as we noted above to the ongoing feuds between rival gangs and to the violence attached to such feuds. Officer Santos knew about general and local gang mores and values, information that was beyond the personal knowledge of the jurors. The rivalry between these two gangs, the gang culture described by Officer Santos, and the evidence at the scene of the shooting demonstrating gang rivalry permitted the jury to conclude circumstantially that appellant had requisite specific intent to promote, further or assist criminal conduct by gang members.

The hypotheticals used to elicit Officer Santos's testimony the shooting was gang-related was a proper evidentiary means for eliciting evidence supporting the enhancement. (*Vang, supra,* 52 Cal.4th at pp. 1050-1051; *Ferraez, supra,* 112 Cal.App.4th at pp. 930-931.) The hypothetical questions here were rooted in the facts of the case. (*Vang*, *supra*, 52 Cal.4th at p. 1045.) The inquiries addressed to Officer Santos did not improperly request that Officer Santos opine as to guilt or innocence or as to whether appellant in this instance had the specific intent to promote, further or assist criminal conduct by gang members. (*Vang, supra*, 52 Cal.4th at pp. 1048 & fn. 4, 1049-1052; *In re Frank S.* (2006) 141 Cal.App.4th 1192, 1199.)

Appellant cites a number of cases in which the trial evidence was found to be insufficient to support the gang enhancement or otherwise support his claims regarding the sufficiency of the evidence: *People v. Martinez* (2004) 116 Cal.App.4th 753, 762; *Ferraez, supra,* 112 Cal.App.4th at pp. 930-931; *In re Frank S., supra,* 141 Cal.App.4th at p. 1199; *People v. Ramon* (2009) 175 Cal.App.4th 843, 852-853; *People v. Ochoa*

16

(2009) 179 Cal.App.4th 650, 657-665; *Albillar, supra*, 51 Cal.4th at pp. 63-65; *Gardeley, supra*, 14 Cal.4th 605; *Mitchell v. Prunty* (9th Cir. 1997) 107 F.3d 1337, 1342; *United States v. Melchor-Lopez* (9th Cir. 1980) 627 F.2d 886, 891; *Garcia v. Carey* (9th Cir. 2005) 395 F.3d 1099, 1102-1105; and *Killibrew, supra*, 103 Cal.App.4th at p. 658. This case presents a classic instance of a retaliatory gang shooting, and none of the cases cited above provide support for setting aside the enhancement. (See *People v. Miranda* (2011) 192 Cal.App.4th 398, 411-412.)[2]

2. *The 10-year term imposed for the gang enhancement was an unauthorized sentence and should be stricken.*

At sentencing, with respect to the finding of the gang enhancement, the trial court imposed and stayed the 10-year term authorized by section 186.22, subdivision (b)(1)(C). It further imposed a 15-year minimum parole date for appellant, claiming this minimum term was required by section 186.22, subdivision (b)(4).

Appellant contends, and respondent agrees, that the provisions of section 186.22, subdivision (b)(1)(C) and subdivision (b)(4), do not apply when a defendant is sentenced to a term of years to life for first or second degree murder and there is a possibility of parole. Appellant's sentence was properly determined by section 186.22, subdivision (b)(5), which provides that the finding of the gang enhancement requires only the imposition, in addition to the sentence for the murder of twenty five years to life, of a minimum term in state prison of 15 calendar years. (*People v. Lopez* (2005) 34 Cal.4th 1002, 1009-1010; *People v. Fiu* (2008) 165 Cal.App.4th 360, 390; *People v. Johnson* (2003) 109 Cal.App.4th 1230, 1236-1240.) We will reverse the trial court's order imposing and staying the 10-year term pursuant to subdivision (b)(1)(C).

---

[2]     In *Albillar,* the California Supreme Court specifically rejected the Ninth Circuit's statutory interpretation of the intent requirement in section 186.22, subdivision (b)(1). (*Albillar, supra*, 51 Cal.4th at p. 66.) Since a state court's interpretation of state law binds a federal court in habeas corpus proceedings, the federal authorities cited above fail to provide support for appellant's claims.

17

The trial court's sentencing order that appellant spend a minimum term of imprisonment of 15 years for the murder before eligibility for parole was proper. However, the reference to section 186.22, to subdivision (b)(4) as support for the imposition of the minimum term of imprisonment was error. Again, the provision supporting the imposition of the minimum term of imprisonment is properly subdivision (b)(5). The reference to subdivision (b)(4) will be stricken.

3. *The abstract of judgment should be amended to reflect the conviction for second degree murder.*

Again, respondent agrees, and so do we, that appellant's contention the abstract of judgment incorrectly reflects his conviction is well taken. The jury returned a verdict of second degree murder, and appellant was sentenced pursuant to that offense to a base term of 15 years to life. The abstract of judgment improperly states appellant was convicted of "1st degree murder." The abstract of judgment should be amended to reflect the jury's verdict and the offense for which appellant was actually sentenced.

This is clerical error that can be corrected in the trial court upon remand. (*In re Candelario* (1970) 3 Cal.3d 702, 705.)

4. *Appellant is entitled to presentence credit.*

At sentencing, appellant received no presentence credit. He contends he is entitled to 638 days of actual presentence custody credit pursuant to section 2900.5. Respondent agrees, and so do we, with the contention.

At sentencing, the trial court observed appellant was taken into custody on April 22, 2011. Appellant was sentenced on January 18, 2013. Accordingly, his pretrial incarceration entitled him to credit for the actual time he was in custody prior to trial, 638 days. (§ 2900.5; 2933.2, subd. (c) [a defendant convicted of murder is not entitled to presentence *conduct* credit in a local facility]; *People v. Duff* (2010) 50 Cal.4th 787, 793, 800-801 [indicating presentence custody credits are available to a defendant convicted of murder, but section 2933.2 makes him ineligible for presentence conduct credits.)

Appellant is not entitled to conduct credits.  Upon remand, appellant is entitled to be awarded 638 days of presentence custody credit.

## DISPOSITION

The judgment is reversed in part, affirmed in part, and the matter is remanded with directions.  The order imposing and staying the 10-year prison term pursuant to section 186.22, subdivision (b)(1)(C), is reversed.  The trial court must strike the reference to subdivision (b)(4) as the authority for the imposition of the 15-year minimum term of imprisonment before eligibility for parole.  On remand, the trial court will order an award of 638 days of section 2900.5 presentence custody credit.  In all other respects, the judgment is affirmed.

The court shall cause the clerk to amend the abstract of judgment to reflect appellant is convicted of second degree murder and to delete the present notations referring to section 186.22, subdivision (b)(1)(C) and indicating a 10-year term for the section 186.22 gang enhancement was imposed and stayed.  The abstract of judgment also should be amended to show appellant has been awarded 638 days of section 2900.5 custody credit, that appellant's conviction was for second degree murder and the term for second degree murder was enhanced by a 15-year minimum term of imprisonment pursuant to section 186.22, subdivision (b)(5).  The amended abstract of judgment shall be sent to the California Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.


We concur:



CROSKEY, J.                                    ALDRICH, J.

19