Filed 6/29/16  P. v. Wright CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRADLEY WRIGHT,<br><br>    Defendant and Appellant. | B257104<br><br>(Los Angeles County<br>Super. Ct. No. BA391654) |

APPEAL from a judgment of the Superior Court of Los Angeles County, George G. Lomeli, Judge.  Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Appellant Bradley Wright challenges his conviction for assault with a firearm, arguing the trial court abused its discretion and violated his constitutional rights when it excluded his ballistics expert at the beginning of trial and denied a continuance to find a new expert. We affirm.

## PROCEDURAL BACKGROUND

Appellant was charged with one count of attempted murder of Cameron Stewart (Pen. Code, §§ 187, subd. (a), 664;[1] count 1) and two counts of assault with a firearm of Cameron Stewart and Stacie L. (§ 245, subd. (a)(2); counts 2 & 3). Various firearm enhancements were also alleged. (§§ 12022.5, 12022.53, subds. (b), (c).) It was further alleged he had three prior strike convictions (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), three prior prison terms (§ 667.5, subd. (b)), and two prior serious felonies (§ 667, subd. (a)(1)). A jury found him not guilty of counts 1 and 3, but convicted him of assault with a firearm in count 2 and found the firearm enhancements true. In a separate proceeding, the trial court found the prior conviction and prison term allegations true. The court sentenced him to 39 years to life, consisting of 25 years to life under the "Three Strikes" law, plus four years for the personal firearm use enhancement (§ 12022.5, subd. (a)), and two 5-year terms for the prior serious felonies (§ 667, subd. (a)(1)). Appellant timely appealed.

## FACTUAL BACKGROUND

The shooting in this case occurred on December 7, 2011, when, according to the prosecution, appellant pointed a gun at Stacie L. and shot at Cameron Stewart. Prior to that day, Stacie L. had dated appellant for about two years and had a son and a daughter with him. In November 2011, after she and appellant had broken up, appellant had an altercation with Stewart, whom Stacie L. was dating at the time. A few days prior to the assault on December 7, Tracie W. (Stacie L.'s close friend akin to a sister) overheard a conversation in which appellant said, "When my hand get better, I'm gonna beat that

---

[1]    Undesignated statutory citations are to the Penal Code unless otherwise noted.

nigga Cameron's ass." Tracie W.'s boyfriend at the time, Gregory Martin, also overheard appellant say, "Just wait until my hand is better, then we'll see what happens."

Stacie L. testified that on December 7, 2011, she and appellant agreed he would bring their daughter to Tracie W.'s apartment in Los Angeles. She was there, along with their son, Stewart, Tracie W., Martin, and Tracie W.'s mother Marie M. About 7:30 p.m., appellant called to tell Stacie L. he had arrived. She went to appellant's truck parked out front. Appellant asked her to bring their son with her, but she refused and asked for their daughter. They began to argue.

According to Stacie L., appellant had their daughter in his lap in the front seat of his truck and he was holding what looked like a gun. He pointed it at Stacie L. and demanded she give him their son. He then put their daughter in the passenger seat and got out of the car. Stacie L. took their daughter out of the car, and appellant grabbed Stacie L. She ran from him. Martin emerged from the apartment, and Stacie L. saw appellant point the gun at him. Stacie L. ran past a gate, turned, and saw appellant running after her. Appellant said, "Is that Cameron[?]" Stacie L. then heard a gunshot and saw Stewart run. Appellant also ran. Stacie L. did not hear a second shot and denied telling police she saw appellant fire twice.

Tracie W. had a somewhat different recollection. As she walked toward a gate outside her apartment, she saw appellant walking toward her holding a gun at waist level. Stacie L. was holding their daughter and following appellant toward the apartment, screaming and yelling at him. Tracie W. was also yelling at appellant to leave. Martin was by the gate calling the police. Marie M. was still inside the apartment by the door. Stewart pushed past Marie M. and exited the apartment. As Stewart came out, appellant said, "Is that that punk ass nigger, Cameron?" Then Tracie W. saw appellant raise the gun up and shoot at Stewart from about 18 feet away. He did not shoot at the ground or into the air. Stewart ran and hopped a fence to a neighbor's yard. Appellant shot in Stewart's direction a second time. Later, Tracie W. showed a defense investigator an "indent in the ground outside" and told him the bullet "probably hit there and went

3

through my door." She noticed a hole in her screen door the next day that had not been there previously.

Marie M. testified she also saw appellant shoot at Stewart. As she was standing near the doorway, she felt the bullet pass close to her: "it felt like it went to the ground, went past my leg. Because it was so close, it—it felt like it hit me, but I know it did not." She saw it ricochet off the ground, leaving an indentation there. She went inside and heard a second shot. She later saw a hole in the screen door she had not seen before the shooting and believed it was caused by the bullet.

Martin testified when appellant raised the gun at him, he lowered it when he realized it was him. He saw appellant fire twice, once when Stewart was outside the apartment door and once as he ran away. For the first shot, appellant was "maybe a few feet from the front door." Martin did not see a ricochet, nor did he see appellant shoot toward the air or the ground. He shot at chest level.

Stewart testified while in custody on unrelated robbery and assault charges. He was present when appellant and Stacie L. got into the altercation in November 2011, but he denied getting into a physical fight with appellant or telling Martin he had done so. He also denied he had seen a gun the night of the shooting, but he admitted he had previously testified he had seen a gun and someone had shot at him.

Los Angeles Police Department Criminalist Jessica Moody examined the hole in the screen door and opined it was caused by the passage of a bullet. Chemical testing yielded copper and lead residue near the hole, consistent with a bullet impact. If the door was open at the time of the shooting, the hole was consistent with a bullet traveling slightly upward. She could not determine the caliber of the bullet from the size of the hole. She also could not accurately determine a trajectory. To do so, she needed "two points" or material solid enough to hold a trajectory rod in place, and the screen door was too thin to provide a solid straight line for a rod. Because the trajectory was slightly upward and the hole was about a foot and a half off the ground, the muzzle of the gun must have been fired from a lower point, or caused by a ricochet. She did not opine a

ricochet occurred, but only that it was possible. No gun, bullets, or casings were introduced at trial.

A defense investigator testified for the defense. He interviewed Tracie W. and Martin two years after the shooting. He confirmed Tracie W. pointed out the hole in the screen door and said appellant "shot down around there."

Appellant testified to his version of events. He admitted he and Stewart got into an altercation a month before the shooting, during which they were pushing and shoving each other, but "no fists [were] exchanged." Prior to the shooting, he had obtained a .45-caliber handgun from a coworker because he was concerned about some members of Stacie L.'s family. He knew he should not have a firearm due to his prior felony convictions.[2] He arrived at Stacie L.'s apartment to drop off their daughter and pick up their son. He parked out front and Stacie L. approached. They argued. He denied pulling the gun, pointing it at her, or threatening her with it. Stacie L. went inside to bring their son out. Appellant took their daughter out of her car seat and waited for her. When she returned without their son, appellant told her to go back and get him. He put their daughter back into her car seat. Stacie L. screamed, "Call the police. Call the police. He's taking my daughter. Help. Help. Call the police." She did not yell that appellant had a gun. Appellant saw Martin approaching and grabbed the gun because he felt threatened. At that moment he did not know Stewart was in the apartment. Stacie L. took their daughter from the truck and walked through the front gate. Martin continued to approach appellant, and appellant said, "Hey, what are you doing? This has nothing to do with you." Appellant held the gun in his left hand because his right hand was in a cast. Martin backed up.

Appellant began running after Stacie L., who was running toward the apartment. At that time he did not intend to shoot the gun. He saw Marie M. standing in the doorway holding his son. Tracie W. ran out of the apartment and appellant ran past her. He saw Stewart run out of the apartment and stop just as Stacie L. was running inside. At

_____

[2]     He admitted he was convicted of robbery and use of a firearm in 1997.

5

the time appellant was 20 feet from the door. Appellant testified Stewart began to "approach[ ] me a little bit," at which point "I lifted the gun in the air and I fired it one time." He explained, "I just felt rushed because they all kind of ran out at me, first [Martin], then Tracie [W.], and then [Stewart]. So I just felt a little, I don't know, scared, I guess." He claimed he was not thinking and "it was a quick reaction" because he wanted them to back off and he was "a little frustrated." He denied he said anything about Stewart and he never used the "n" word. He also denied shooting at the screen door or shooting a second time. He explained, "Marie [M.] was in the door with my son, and there's absolutely no way on this planet that I would put my son's life in danger like that, for no one." He would "rather shoot myself than put my son's life in danger like that."

## DISCUSSION

Appellant claims the trial court abused its discretion and violated his constitutional rights to due process, a fair trial, effective assistance of counsel, and to present a defense when it excluded appellant's proposed ballistics expert Dr. Bruce Krell at the start of his trial as unqualified to give expert ballistics testimony and then denied his request for a continuance to find a new expert.

### 1. *Procedural Background*

Appellant faced trial twice. Before the first trial, he was granted in propria persona status with standby counsel. He requested and was appointed Dr. Krell from the Los Angeles County Superior Court's criminal expert panel as a ballistics expert. The prosecution moved to exclude Dr. Krell's testimony from the first trial as irrelevant because the prosecution was not intending to offer any evidence on ballistics. The prosecutor explained a casing was found 15 feet away from the door of the apartment and a live round was found in the gutter, but no gun was ever recovered and therefore no testing was done linking the bullet or casing to the weapon used in the shooting. Even so, appellant raised a concern that there had been prior "testimony" that the bullet struck the ground and caused the hole in the screen door. The prosecutor explained a detective who went to the crime scene had reached "some conclusions" in a police report about how the

6

bullet might have produced the marks in the asphalt and a hole in the screen, but she did not intend to introduce that evidence, or again, any ballistics-related information. The court deferred ruling until the close of the prosecution's case and prohibited appellant from mentioning Dr. Krell's testimony in his opening statement. Appellant objected. Appellant raised the issue again later, and the court adhered to its ruling, specifically noting it was not addressing Dr. Krell's qualifications. The court never revisited these issues because appellant relinquished his in propria persona status after two witnesses testified, his standby counsel was appointed, and the court granted his motion for a mistrial.

After the mistrial, another judge in the Los Angeles Superior Court excluded Dr. Krell's testimony from a criminal case because he was not qualified to give opinions on reconstruction of a shooting from a vehicle and bullet trajectory, among other reasons.

About six months later, on the day before appellant's second trial was set to begin on April 3, 2014, the prosecution filed another motion to exclude Dr. Krell's testimony. The prosecution explained that, after the first mistrial, Moody visited the scene of the shooting and concluded the impact in the door was consistent with the passage of a bullet. The prosecution intended to introduce Moody's testimony along with a .45-caliber bullet found several feet from the front door (although the bullet was never introduced), but did not intend to introduce evidence of any markings on the asphalt. On that basis, the prosecution argued Dr. Krell's testimony was irrelevant and he lacked expertise as found by the judge in the criminal case noted above. The prosecution also attacked many of the 59 slides Dr. Krell intended to use during his testimony.

That same day, defense counsel (who had been appellant's standby counsel in the first trial) complained to the court he was "sandbagged" by the motion. He noted appellant was unrepresented by counsel in the first trial, and the prosecution had moved to exclude Dr. Krell's testimony from the first trial only as irrelevant, not because he was unqualified. Defense counsel argued exclusion of Dr. Krell's testimony would deprive appellant of a "crucial defense," i.e., "testimony about ricochets and about a hole in a screen door, about whether or not it could have been caused by a bullet, and certain other

7

testimony that would be crucial to his defense." He complained if the court excluded Dr. Krell, he would be unable to find another expert and prepare him or her to testify. He also noted Dr. Krell had not informed him of the ruling by the judge in the other criminal case months earlier. He requested the court discharge the jury and return the case to the pretrial stage to address the motion.

The court stated, "The bottom line is where are you going to find a ballistics expert, or any expert, even if the court were to afford you the time, to say that a person did not intend to shoot an individual because he's a bad shot? [¶] The person could intend to shoot an individual and just be an entirely bad shot. Unless you can prove that [appellant] is an expert marksman . . . ." Defense counsel responded, "[T]he bullet hole is about 1 foot above the bottom of the screen door— [¶] . . . [¶] —and the only way that bullet hole could be there, if it is a bullet hole, would be by a ricochet. [¶] Dr. Krell went out there and trajectory-rodded the ricochet, and it showed that the ricochet would have to be very steep, and if [appellant] were shooting, he would have to be virtually standing next to the victim, Cameron Stewart." Defense counsel clarified appellant's defense was going to be that he never had a gun and never shot it, and Dr. Krell's testimony would support that position. On that basis, the court viewed the ricochet testimony as irrelevant, but it planned to permit Moody to testify the hole in the screen door was from a bullet.

The prosecutor claimed she had notified defense counsel about Dr. Krell's lack of qualifications several months earlier in January 2014. Defense counsel did not deny that notice, but countered that the prosecutor only expressed concerns about Dr. Krell's "reputation, not lack of qualifications." The court expressed doubt about Dr. Krell's expertise to opine that the hole in the door could not have been made by appellant shooting from 20 feet away, given his background was in "trajectories with respect to missiles." The court also noted Dr. Krell was listed on the Los Angeles County Superior Court's criminal expert panel as an expert in "firearms operations, classifications, and safety," not ballistics. Defense counsel disagreed. The prosecutor affirmed she would

8

not introduce any evidence of a ricochet and none of the witnesses would testify to a ricochet.

The court held a full hearing on the motion the next day after the jury was empaneled but before starting trial. Defense counsel changed his position and stated appellant's defense would not be that he never had a gun. The court explained its understanding that the prosecution would not offer evidence of a ricochet, so it was challenging Dr. Krell's testimony as irrelevant and unqualified on the subjects of "ballistics and/or criminology or as a crime scene expert." The court also noted the ruling in the other criminal case excluding Dr. Krell's ballistics opinions. The court was inclined to find Dr. Krell's testimony relevant because the prosecution intended to offer ballistics evidence that it did not plan to introduce in the first trial, but it questioned Dr. Krell's qualifications.

Dr. Krell testified in detail to his qualifications and proposed opinions. According to him, he was placed on the Los Angeles County Superior Court's criminal experts panel in the section on "firearms operations, classifications and safety in the specific areas of ballistics, firearms ID, firearms safety and assault weapons law." He understood he was qualified as an expert on bullet trajectory and ricochet as part of "ballistics." He had never worked in a crime lab but he taught a day of ballistics to every sniper class for two years at Marine sniper school. He had a PhD in applied mathematics and had worked for the government with top secret clearance. His knowledge of ballistics was "a combination of self taught and actual experience applying ballistics both to firearms training, teaching snipers and working on defense systems." He had testified 25 or 30 times as an expert and was qualified as a ballistics expert 15 or 20 times. He also had expertise on bullet ricochets as part of ballistics.

He was questioned on a detective's report that the hole in the screen was the result of a double ricochet, and he opined that was impossible. He explained he went to the location of the shooting and examined the hole in the screen. He dropped a trajectory rod into the hole to allow it to settle into the orientation of the hole. The hole was just over one foot from the ground with an upward trajectory of 50 degrees, an "extremely steep"

9

angle. He found no areas that could have caused the bullet to follow that upward trajectory and could find no rational explanation for how that angle could have been produced by someone shooting low from 15 or 20 feet away. Instead, the angle would have been slightly downward. He attempted to test the angle on asphalt with a .45-caliber firearm and produced an angle of 8.8 degrees. At a 50-degree angle, the bullet would have broken into pieces in the asphalt. He also measured the hole and opined it was smaller than what a .45-caliber bullet would produce.

On cross-examination, he testified he relied on the rod in the hole for his measurements, not any markings on the asphalt. The court asked whether the measurement would be different between a rod settling in the hole due to gravity and a bullet shot from a firearm, and he responded the rod was "measuring what the bullet had already done in the hole." He said he used the rod to calculate the angle of the bullet. He concluded there was no ricochet because, if the bullet had ricocheted, it would have done so at an impossible angle to produce the upward angle of the hole. He ultimately concluded the hole was not caused by a bullet at all because "the only other way that there could be a bullet hole there is if the person were shooting in that direction, and the hole would have been downward, not upward." In response to questioning about the size of the hole, he maintained his opinion it was too small for a .45-caliber bullet. He did not chemically test the hole.

The court then questioned him about his qualifications. He had no training from the sheriff's department, the FBI, the Los Angeles Police Department, or the Department of Justice. He had never taken a class on crime scene reconstruction and was not certified in the area, although he had "just done a lot of it." He was listed on the Los Angeles County Superior Court's criminal expert panel for firearms operations, classifications, and safety, which he claimed included ballistics. The court pointed out this case involved trajectory and "[b]allistics only incorporates a certain amount of the subject of trajectory." The court asked, "[H]ow did you become an expert in ballistics, other than you working for the defense systems at one point and inputting or encoding the trajectory of missiles, not bullets?" He responded, "I have done dozens of ballistics

10

studies for the Department of Defense on contract," but admitted none of them involved bullets. The court noted his expertise was "self-taught." He added, "[w]ith practical experience, yes."

Defense counsel argued a self-taught expert can be qualified and, given Dr. Krell's testimony in other cases on trajectory and ballistics, "it would be ludicrous not to allow him to testify." Defense counsel believed he was a "crucial witness" for the defense. The prosecutor did not doubt he had expertise in firearms operations, classifications, and safety, but she argued he had no training in ballistics and had not qualified as a criminalist or a crime scene reconstruction expert. "The fact that he goes out to the scene and conducts his own experiments does not make him an expert, particularly where he has no training in that regard."

The court excluded his testimony because he was unqualified in the area of bullet trajectory. It noted a number of his conclusions were based on speculation and "assume a lot." It explained he had no training, had never taken a class on crime scene reconstruction, and was not certified in that area. Although an expert could be self-taught, Dr. Krell did not address the circumstances under which that occurred. While he was listed in the Los Angeles County Superior Court's criminal expert panel for firearms operations, classifications, and safety, "there's no evidence that he has any specialized training with respect to forensic criminology and trajectory, other than his stint with the defense department and measuring and encoding into the computer, the trajectory of a certain missile or missiles, not bullet[s] or things fired from a firearm." The court also noted his degrees in mathematics, English, management, economics, operations research, and statistics, but found he lacked the "appropriate foundation and/or expertise to permit this testimony on the subject of ballistics forensics or bullet trajectory and/or crime scene reconstruction."

The court denied a continuance so defense counsel could locate another expert due to the prosecution's alleged insufficient notice, reasoning, "The whole purpose of the [Evidence Code section] 402 pretrial motion and motions in limine are precisely designed and appropriate—and the appropriate apparatus, I should say, to challenge, among other

11

things, qualifications of a proposed expert witness.  [¶]  At the end, it remains that the defense opted for and selected this particular witness, Mr. Krell."

The court indicated it was going to hold the prosecution to its representation that it would not present evidence of a ricochet unless defense counsel wanted to question the prosecution's expert on that area.  The court would also allow defense counsel to cross-examine the prosecution's expert on the size and angle of the hole and whether it could have been made from where the appellant was standing according to the witnesses.  At the end of the hearing, defense counsel again argued he was never told about the prosecution's challenge to Dr. Krell's qualifications, but only about his "reputation."

After Moody testified at trial, appellant moved for a mistrial.  Defense counsel argued Moody testified "completely opposite" of Dr. Krell and opined that everything Dr. Krell had said was "basically, wrong."  He also noted Moody did not say in her expert report that she could not measure the hole with a trajectory rod, only that the angle was slightly upward.  The court denied the motion, reiterating its ruling that Dr. Krell was not qualified to give opinions on those issues, and "the court, having found that he was not an expert in that area, cannot then use that to compare it to what the criminalist, Ms. Moody, testified to."

About a month after trial and six weeks before sentencing, appellant filed a written new trial motion, reiterating his arguments that Dr. Krell was qualified and the court should have granted a continuance.  He did not indicate whether he had made efforts to locate a new qualified expert who would give opinions favorable to his case.

In opposition, the prosecution stood by its prior contentions Dr. Krell was not qualified, and provided more detail surrounding its notice to appellant.  The prosecutor explained that in February 2014, she had received an e-mail from Moody indicating Dr. Krell had left her a message requesting she walk through her crime scene analysis. Moody explained criminalists in the Los Angeles Police Department normally do not meet with defense experts, and she expressed concerns about Dr. Krell in particular due to inaccuracies in his work, his reputation in the community, and "a specific instance where he characterized a brief contact with law enforcement as part of his training and

12

experience." The prosecutor left a message for defense counsel to advise Dr. Krell to direct all inquiries to her. When defense counsel sought to arrange a meeting with counsel, Dr. Krell, and Moody at the crime scene, the prosecutor declined. She "relayed the concerns articulated by [Moody] about Mr. Krell and mentioned the fact that Krell had been excluded as an expert witness in the San Fernando courthouse." She explained the prosecution had been preparing a challenge to Dr. Krell's qualifications due to rulings on his lack of qualifications by other judges, and defense counsel could have discovered those recent rulings "upon simple inquiry of the expert himself."

In denying the motion, the court noted the motion appeared "to allege, basically, in a nutshell, that the expert was prepared to offer testimony in order to negate the specific intents associated with the original charge of the attempted murder and/or that the defendant did not discharge the firearm in question. [¶] However, the defendant admitted discharging a firearm by his own testimony in trial. Of course, he disputes that he ever fired at the door in question, or the screen door, but rather fired in the air. But he admits that he discharged the weapon, nonetheless. [¶] In addition, in the end, the jury did not find that the attempted murder charge was true. So whatever evidence Mr. Krell could have offered, even if it is assumed for argument's sake that his testimony should have been allowed, is harmless."

## 2. *Exclusion of Dr. Krell's Testimony*

"'California law permits a person with "special knowledge, skill, experience, training, or education" in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id.*, § 801).'" (*People v. Vang* (2011) 52 Cal.4th 1038, 1044.) "The qualification of expert witnesses, including foundational requirements, rests in the sound discretion of the trial court. [Citations.] That discretion is necessarily broad: 'The competency of an expert "is in every case a relative one, i.e. relative to the topic about which the person is asked to make his statement." [Citation.]' [Citation.] Absent a manifest abuse, the court's determination will not be disturbed on appeal." (*People v. Ramos* (1997) 15 Cal.4th 1133, 1175 (*Ramos*).)

13

We find no abuse of discretion here. The trial court carefully delineated the relevant areas of expertise—bullet trajectory and crime scene reconstruction. Then, after hearing Dr. Krell's detailed testimony on his qualifications and opinions, it found he had no certification or formal training from any law enforcement agency in the relevant areas, and he was certified on the Los Angeles County Superior Court's criminal expert panel only in the areas of firearms operations, classification, and safety. His background in trajectory and crime scene reconstruction was based entirely on his experience and self-teaching. While that might suffice in some circumstances to qualify an expert to opine in a particular area, the trial court specifically noted it had little information on the circumstances surrounding Dr. Krell's self-teaching and experience. The information it did have showed his practical experience appeared to be in the area of missile trajectory, which the trial court reasonably concluded was not relevant to giving an opinion on bullet trajectory. While he also taught a day of ballistics to every sniper class for two years at Marine sniper school, he provided no details on what exactly he taught or how he prepared himself to teach those classes. Moreover, the trial court had before it at least one ruling from another judge excluding Dr. Krell's expert opinions on ballistics due to lack of qualifications.[3] Against this record, we cannot say the trial court exceeded its broad discretion to find him unqualified to render his opinions on bullet trajectory and crime scene reconstruction. We have reviewed appellant's contrary arguments and find them unpersuasive.

We also find, on this record, the trial court's exercise of discretion did not violate his constitutional rights. (*Ramos, supra*, 15 Cal.4th at p. 1176 [trial court's exercise of discretion excluding defense expert was consistent with constitutional principles].)

### 3. *Denial of Continuance*

"[T]he trial court has broad discretion to determine whether good cause exists to grant a continuance of the trial. [Citation.] A showing of good cause requires a

---

**3** We granted judicial notice and have reviewed the lengthy transcript of the hearing on Dr. Krell's testimony in that case.

14

demonstration that counsel and the defendant have prepared for trial with due diligence." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037.) To obtain a continuance to secure a witness's attendance, "the defendant must establish 'he had exercised due diligence to secure the witness's attendance, that the witness's expected testimony was material and not cumulative, that the testimony could be obtained within a reasonable time, and that the facts to which the witness would testify could not otherwise be proven.' [Citation.] The court considers '"not only the benefit that the moving party anticipates but also the likelihood that this benefit will result, the burden on other witnesses, jurors, and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion."'" (*Ibid.*)

Because the grant or denial of a continuance is discretionary, a defendant bears the burden to show "'an abuse of discretion, and an order denying a continuance is seldom successfully attacked. [Citation.] [¶] Under this state law standard, discretion is abused only when the court exceeds the bounds of reason, all circumstances being considered. [Citations.] Moreover, the denial of a continuance may be so arbitrary as to deny due process. [Citation.] However, not every denial of a request for more time can be said to violate due process, even if the party seeking the continuance thereby fails to offer evidence. [Citation.]'" (*People v. Fuiava* (2012) 53 Cal.4th 622, 650.)

We find no abuse of discretion in denying a continuance here. We certainly understand appellant's predicament when the prosecution moved the day before trial to exclude Dr. Krell, and the court excluded his testimony and immediately began trial. If that were the first time appellant had been notified of the issues surrounding Dr. Krell's qualifications, appellant would have had no time to find a replacement expert. Nor do we think it was necessarily fair for the trial court to lay blame at appellant's feet by saying, "At the end, it remains that the defense opted for and selected this particular witness, Mr. Krell." Dr. Krell was initially appointed from the Los Angeles County Superior Court's criminal expert panel while appellant was pro se, and the prosecution did not challenge his qualifications in the first trial, opting instead to pursue a trial theory that rendered his opinion irrelevant.

With that said, however, there was evidence appellant was notified several months before trial that the prosecution was questioning Dr. Krell's qualifications, which came on the heels of another judge excluding Dr. Krell's testimony in a criminal case for a similar lack of ballistics expertise. Dr. Krell himself could have disclosed to appellant and defense counsel that he had been excluded from another trial as a ballistics expert. Although defense counsel claimed he only had notice the prosecutor was questioning Dr. Krell's "reputation," the court implicitly credited the prosecutor's representations, which provided sufficient notice for defense counsel to prepare for the possibility Dr. Krell would be excluded from trial. (See *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1548 [prior notice of prosecution's gang expert resulted in waiver of right to continuance to seek defense gang expert].)

Perhaps more important, even if appellant did not receive adequate notice, he has not shown he would have benefitted from a continuance. At no point in the trial court or on appeal has appellant suggested he could have found a qualified expert who would have shared Dr. Krell's opinions. (See *People v. Howard* (1992) 1 Cal.4th 1132, 1171 (*Howard*) [continuance not warranted when "defendant did not show that any expert existed who would be willing and able to offer material testimony within a reasonable time"].) This is particularly troubling here, given the trial court found Dr. Krell lacked the expertise to give his opinions favoring appellant. That raises the question whether any *qualified* expert would have been able to give the same opinions.

For these reasons, we think substantial justice was served by moving forward with trial. Despite denying a continuance, the court held the prosecution to its representation that it would not argue the bullet ricocheted, which the prosecutor heeded, even though Moody testified a ricochet was possible and other witnesses testified a ricochet occurred. Nor did the court restrict appellant's ability to cross-examine Moody on her opinions. On the other hand, a continuance would have engendered significant delay, placing burdens on the court, the witnesses, and the jury (presuming the jury could even remain empaneled). Thus, there was no abuse of discretion.

We also conclude, under these facts, the denial did not violate appellant's constitutional rights. "'[N]ot every denial of a request for more time . . . violates due process even if the party fails to offer evidence or is compelled to defend without counsel.'" (*Howard, supra*, 1 Cal.4th at pp. 1171-1172 [lack of diligence and failure to show a timely qualified expert could be found defeated any claim of constitutional error]; see *People v. Jenkins, supra*, 22 Cal.4th at pp. 1039-1040.)

**DISPOSITION**

The judgment is affirmed.


FLIER, J.

WE CONCUR:


RUBIN, Acting P. J.


GRIMES, J.